Nicola MAFFIA
v.
UNITED STATES.
No. 135-54.

United States Court of Claims.
July 16, 1958.

————◇————

Thomas M. Gittings, Jr., Washington, D. C., for plaintiff. Wilmurt B. Linker, New York City, Evan Howell, and King & King, Washington, D. C., were on the briefs.

Kathryn H. Baldwin, Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant.

WHITAKER, Judge.

Plaintiff seeks to recover on account of the payment by him, as assignee, of the balance due of $10,800 by one James J. McSweeney on a contract with defendant for the purchase of three surplus tugs. Plaintiff paid this sum pursuant to an assignment of the contract which he had received from McSweeney. Plaintiff alleges that the payment by him was conditioned upon the transfer of the title to the tugs to him, but that defendant transferred title to the original purchaser, instead of to plaintiff.

When this case was before us on defendant's motion for summary judgment, we held (142 F.Supp. 891, 135 Ct.Cl. 604) that plaintiff's assignment from McSweeney was invalid under the statute (41 U.S.C.A. § 15) forbidding the assignments of contracts with the United States and, hence, unenforceable against the Government. While this precluded plaintiff from recovery under the assignment, we indicated that plaintiff might be entitled to a refund of his $10,-800, depending on the facts surrounding its payment, and we referred the case to a commissioner for trial. By a subsequent order of March 20, 1957, evidence to be taken was "limited to the establishment of the circumstances under which the plaintiff's check for the sum of $10,-800 was delivered to and accepted by the defendant." The trial commissioner's report shows the following, which we find to be the facts:

On February 10, 1948, McSweeney's offer, accompanied by a deposit of $1,-200, to purchase three surplus tugs for a total price of $12,000 was accepted by the Paris office of the Central Field Commissioner, Office of the Foreign Liquidation Commission, Department of State. Under the terms of the sale the balance of the purchase price was to be paid within 30 days, payment to be made either to the "Central Field Commissioner, Europe", or to the Office of the Foreign Liquidation Commissioner, Washington, D. C., or to any official of the United States Government designated by the Commissioner.

McSweeney encountered difficulty in raising the balance of the purchase price and upon request secured a 15-day extension, to March 25, 1948, for payment of the balance. In his efforts to finance the undertaking, McSweeney, who at the time was residing in Rome, Italy, contacted plaintiff's office in that city, which in turn contacted plaintiff, who was in New York City. Plaintiff was interested, and arrangements were made for McSweeney's representative to go to New York to negotiate with him. On or about March 24, 1948, one A. G. Van Wye, plaintiff's representative, met with the plaintiff in New York, and showed plaintiff the power of attorney executed by McSweeney appointing him his attorney-in-fact, with "full power and authority to do everything whatsoever necessary to be done in connection with the inspection, repair, modification, and sale (to transfer title in full to yourself, or at your discretion, to others)" of the three tugs to be purchased under the subject contract.

After discussing the transaction at length, plaintiff offered to pay the balance of the purchase price, provided arrangements could be made to have title to the tugs issued in his name. Van Wye, on behalf of his principal, agreed to this. At the same time attorney Van Wye and plaintiff entered into a further agreement, which, in addition to reciting that plaintiff was to receive title to the tugs, provided that McSweeney was to make the arrangements necessary to make the tugs seaworthy, with money to

be provided by plaintiff, and that on a sale of the boats, plaintiff was to receive $3,000 plus all money advanced by him, and that the balance of the sales price would be divided, 30 percent to plaintiff, and 70 percent to McSweeney.

On March 25, 1948, Van Wye went to the office of Orin de Motte Walker, an attorney whom plaintiff had employed. Walker prepared a new assignment, assigning to plaintiff all of the right, title and interest which McSweeney possessed in the tugs. The two then proceeded to the Office of the Foreign Liquidation Commissioner where they met with Raymond J. Queenin, Acting Director of the Budget and Accounting Division of the Office of the Foreign Liquidation Commissioner.

Before further recitation of the special facts relating to this transaction, it seems appropriate to define Queenin's authority. His principal responsibility and duty was to maintain a general inventory control, receive reports of sales and copies of sales documents and make statistical reports, but he was authorized to receive payments of amounts due on contracts. With respect to such payments, on contracts which were made abroad, the sole function of Queenin's division was to accept payment, deposit the money with the Army Finance Officer, and advise the contracting officer of the payment. Queenin had no authority to act in any way in connection with the negotiation, execution, administration, alteration, modification, or consummation of contracts made abroad for the sale of surplus property, including the acceptance of assignments of such contracts.

Walker and Van Wye told Queenin of the assignment to plaintiff of the contract to purchase the tugs, and that plaintiff proposed to put up the balance of the purchase money on certain conditions, the chief of which was that Queenin would not deliver plaintiff's check in payment of the balance, unless he was assured that the title to the tugs would be issued in plaintiff's name. Queenin stated that the title documents would have to

be issued by the Paris office, and that he could not agree to return the amount of the payment to plaintiff in the event the contract was not consummated, as Walker had requested. Because of this, and the fact that the assignment drafted by Walker, and signed by Van Wye, purported to transfer title to the tugs, which, until payment was made, McSweeney did not have, the assignment from McSweeney to plaintiff was redrafted by Walker in Queenin's office to provide, first, that any refunds which might be due with respect to the subject contract, if it was not consummated, were to be turned over by McSweeney to plaintiff, and, second, that McSweeney assigned his interest in the contract, and not title to the tugs, as the former assignment had done.

Queenin then accepted from Walker plaintiff's check for $10,800 and prepared and signed the following receipt, dated March 25, 1948, which was delivered to Walker:

"Received from Nicola Maffia certified check No. 128 drawn on Manufacturers Trust Company, New York, in the amount of $10,800.00 payable to Treasurer of the United States as a payment on contract W–ANL (ETO–II)–4098. This payment is made on behalf of James J. McSweeney, the purchaser, who has assigned the contract to said Nicola Maffia."

On this same date the following cablegram was transmitted by the Washington office of the Foreign Liquidation Commissioner to the Paris office:

"Received $10,800 from Nicola Maffia on contract (ETO II)–4098. Advise McSweeney, Rome that full payment has been made. 1044's follows." [What "1044's" are is not explained.]

Thereafter on March 31, 1948, the Paris office notified McSweeney that payment on his contract had been received. On April 1, 1948, the bills of sale were forwarded to McSweeney, and on April 16, 1948, he accepted delivery of the tugs

**862**

at Malta. Whether this was in violation of the condition on which plaintiff paid the balance of the purchase price is in dispute.

The trial commissioner has found that "it was agreed * * * that Queenin would cable the Paris office that the balance of the contract price had been paid by plaintiff, that McSweeney had assigned the contract to plaintiff, and that the title documents were to be issued in plaintiff's name and sent to his Rome office." The trial commissioner further found that "it was understood that the power of attorney and assignment would be forwarded to the Paris office for completion of the transaction." Defendant has excepted to this finding, taking the position that Queenin agreed only that he would send a cablegram to the Paris office advising that payment had been made by plaintiff, and notifying the Paris office of the assignment. However, apart from what may have been the understanding between Walker and Queenin with respect to notice to Paris relative to the issuance of the title documents, under the terms of the receipt plaintiff was entitled to have the Paris office notified by Queenin that the payment had been made on condition that the assignment of the contract to him would be recognized by defendant.

Queenin had no authority to agree to the assignment, but he did have authority to accept payment, and that authority imposed on him the obligation of not only notifying the contracting officer as to the fact of payment, but also of the conditions upon which the payment had been made.

 The cablegram to Paris did not do this. As a result, the Paris office, which was the office with authority to act on the matter, was never notified of the assignment. Despite the bar of the Anti-Assignment statute (41 U.S.C.A. § 15), the Government, if it chooses to do so, may recognize an assignment. Defendant concedes this. Here, because of the failure of Queenin's office to notify the Paris office of the terms of the payment, it did not either recognize or repudiate the assignment. If that office had elected to recognize the assignment, it would have been obliged to transfer title to the tugs to the plaintiff. If it declined to recognize the assignment, then plaintiff would have been entitled to recover his $10,800.

Had the contracting officer been advised of the terms of the payment, plaintiff would either have received title to the tugs or the return of his money. At least, he was entitled to one or the other. That he was not so advised was the fault of the defendant. Plaintiff is entitled to no less than a return of his money. He is not entitled to more, unless the assignment is good, and it is not good, unless the contracting officer chooses to recognize it and make it good; otherwise, it is contrary to law. He never recognized it. Defendant, therefore, cannot be charged with a breach of the obligation of the assignment. But it is to be charged with a breach of the obligation to acquaint the contracting officer with the conditions upon which the payment was made.

Had the contracting officer been advised of these conditions, he would have been compelled to have done one of two things, either to recognize the assignment, or to return plaintiff's money. He was not obligated to recognize the assignment, but he was obligated to return plaintiff's money, if he did not recognize it. The reasoning found in United States v. State Nat. Bank, 96 U.S. 30, 35, 24 L.Ed. 647, is applicable here. There the Court stated:

> "An action will lie whenever the defendant has received money which is the property of the plaintiff, and which the defendant is obliged by natural justice and equity to refund. The form of the indebtedness or the mode in which it was incurred is immaterial."

 One more thing: While it is true that there was a considerable lapse of time before plaintiff called to the attention of the Government McSweeney's repudiation of the assignment, we do not

believe that this fact is sufficient, in the light of plaintiff's agreement with McSweeney, to charge him with laches. Under that agreement it was McSweeney who was to take delivery of the tugs, and to arrange for the making of necessary repairs, and to provide for their eventual sale. Plaintiff, therefore, had no reason for complaint because defendant delivered the tugs to McSweeney. It was apparently a year later that he learned that McSweeney had dishonored the assignment.

Judgment will be entered for plaintiff in the sum of $10,800.

It is so ordered.

JONES, Chief Judge, and LARAMORE, MADDEN and LITTLETON, Judges, concur.