**TUFTCO CORPORATION**

v.

**The UNITED STATES.**

No. 415–78.

United States Court of Claims.

Jan. 23, 1980.

Before DAVIS, KUNZIG and BEN-NETT, Judges.

## ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT

KUNZIG, Judge.

This case, involving the assignment to plaintiff of contracts for the purchase of mobile homes by the Department of Housing and Urban Development (HUD), is before the court on cross motions for summary judgment. Plaintiff complains that the Government, though it was aware of and recognized assignment of the contracts from the original contractor to plaintiff, nevertheless wrongfully forwarded some of the payments due under the contracts to the original contractor, resulting in plaintiff's loss. The Government, relying on the Anti-Assignment Act, 41 U.S.C. § 15 (1976) (hereinafter, "Act" or "Anti-Assignment Act"), contends the contracting officer lacked authority to recognize the assignments; therefore the payments to the original contractor were proper. We find the contracting officer possessed the requisite authority to waive the Act's requirements and that the actions of defendant constituted a valid recognition of the assignments. Accordingly, we award judgment in favor of plaintiff.

Though this action is brought in the name of Tuftco Corporation, the company first involved in the dispute was Winchester Homes, Inc., (hereinafter, "Winchester") a wholly owned subsidiary of Tuftco which subsequently merged with Tuftco. The assignment of two HUD contracts to Winchester are at issue. The first was contract H–3154 for the purchase of 200 new mobile homes for flood disaster use which was awarded by HUD to the Grant Enterprises Division of Prudential Mortgage Investment Corporation (hereinafter, "Grant") on July 24, 1972. Grant immediately sought out Winchester to manufacture and make delivery of all the mobile homes called for by this contract. Winchester was agreeable

Richard P. Jahn, Sr., Chattanooga, Tenn., attorney of record, for plaintiff. Tanner & Jahn, Chattanooga, Tenn., of counsel.

Gerald L. Schrader, Washington, D.C., with whom was Asst. Atty. Gen. Alice Daniel, Washington, D.C., for defendant.

to assignment of the contract provided all payments due under it would be made directly to Winchester.

After discussing the assignment with HUD's contracting officer, Mr. Ralph Scroggs, Grant assigned the contract to Winchester on July 27, 1972. By letter of the same day Mr. Harold Gradsky, Vice-President of Grant, advised the contracting officer, Scroggs, of the assignment and informed him that all payments due under the contract were to be made directly to Winchester. By letter of July 28, 1972, Mr. David N. Meyers, Secretary-Treasurer of Winchester, sent five copies of the notice of assignment from Grant, signed by Gradsky, to the contracting officer in Washington, D.C. The Meyers letter closed with the statement, "We look forward to working with you in furnishing this emergency housing."

Accordingly, mobile homes were delivered by Winchester to HUD and accepted by HUD. As contemplated by the assignment agreement, HUD, on September 7, 1972, made the first payment due under contract H–3154 of $300,457.80 to Winchester. For some reason, however, of the remaining nine payments made under the contract through December 11, 1972, only one other, on October 16, 1972, in the amount of $114,258.60 was sent to Winchester; all the other payments went directly to Grant[1] without notice to Winchester, though Winchester, upon discovery, complained to HUD about the undelivered payments.

The second contract, H–3341, also for 200 mobile homes, was awarded to Grant by HUD on August 10, 1972. Again Grant enlisted Winchester's participation, but in this instance for only one-half of the contract's obligations; that is, Winchester would provide HUD 100 mobile homes. Winchester and Grant agreed to assignment of the second contract, H–3341, on August 11, 1972. Unlike the first assignment, all payments due under the second contract were to be sent to the Atlanta law firm of McClain, Millen, Bowling & Hickman, which would act as disbursing agent for such funds. By letter of August 11, 1972, Gradsky informed Scroggs of assignment of the second contract. At the bottom of this letter the contracting officer wrote "Assignment acknowledged, Ralph T. Scroggs, 8/15/72."

Winchester proceeded to deliver mobile homes to HUD under this second contract, as under the first. HUD made a total of 11 payments under the second contract, H–3341. The first three, all dated September 19, 1972, were made directly to Grant. The fourth and fifth went to the Atlanta law firm. The remaining six payments again were made directly to Grant.[2]

It is appropriate to emphasize that before each assignment was effected both Winchester and Grant contacted Scroggs, the contracting officer, to inform him of their proposed arrangements. Scroggs advised them that, despite the Anti-Assignment Act, if Winchester would assume Grant's obligations HUD would make all payments directly to Winchester on the first contract and to the law firm for the second contract, instead of directly to Grant. Winchester's agreement to the assignment with Grant

1. The schedule of payments made by HUD under contract H–3154 as evidenced by defendant's Exhibit 8, is as follows:

| Date Paid | Paid To | Amount |
| --- | --- | --- |
| 9/7/72 | Winchester | $300,457.80 |
| 9/19/72 | Grant | 165,040.00 |
| 9/19/72 | Grant | 8,463.60 |
| 10/16/72 | Winchester | 114,258.60 |
| 11/13/72 | Grant | 32,678.00 |
| 11/20/72 | Grant | Amount uncertain |
| 11/21/72 | Grant | 4,466.90 |
| 11/21/72 | Grant | 4,466.90 |
| 11/22/72 | Grant | 8,933.80 |
| 12/11/72 | Grant | 34,085.50 |

2. The schedule of payments made by HUD under contract H–3341, as evidenced by defendant's Exhibit 8, is as follows:

| Date Paid | Paid To | Amount |
| --- | --- | --- |
| 9/19/72 | Grant | $ 18,282.00 |
| 9/19/72 | Grant | 81,971.70 |
| 9/19/72 | Grant | 171,437.95 |
| 9/27/72 | Atlanta law firm | 16,049.60 |
| 10/10/72 | Atlanta law firm | 60,581.50 |
| 10/31/72 | Grant | 172,399.35 |
| 11/20/72 | Grant | 14,877.00 |
| 11/21/72 | Grant | 9,529.45 |
| 11/28/72 | Grant | 4,570.45 |
| 12/14/72 | Grant | 25,937.45 |
| 2/6/73 | Grant | 5,814.72 |

was conditioned upon its belief HUD payments would be made to it rather than Grant.

Though a certain number of mobile homes were manufactured and delivered to HUD by Winchester, HUD terminated both contract 3154 and contract 3341 for default on September 8, 1972. The validity of the default termination is not at issue.

Whether through mistake, inadvertence or by intentional decision, HUD made total payments of approximately $260,000 to Grant under contract H–3154 and approximately $504,800 to Grant under H–3341. Gradsky, Grant's Vice-President, turned over a portion of the payments to Winchester but fraudulently disposed of the balance and failed to account to Winchester or to the law firm on behalf of Winchester.

In March 1973 Winchester filed suit against Grant and Gradsky in the United States District Court for the Eastern District of Tennessee, Southern Division, Civil Action No. 6710, seeking recovery of Winchester's share of the payments made by HUD directly to Grant. On December 4, 1974, the court entered judgment for Winchester in the amount of $111,895.86, including interest, against Grant and Gradsky. Despite Tuftco's diligent efforts to collect the judgment it has been unable to recover any of it.[3] On September 18, 1978, plaintiff filed its petition in this court to recover from the Government the $111,895.86 judgment it cannot collect from Gradsky.

Before this court plaintiff argues it would have suffered no loss had - the Government made all payments due under the contracts directly to Winchester or the law firm as contemplated by the assignments, instead of to Grant. Despite the contracting officer's full knowledge of the assignment and his written and oral consent thereto, payments were nevertheless forwarded to Gradsky even after defendant made initial payments according to the terms of the assignments. Though the Anti-Assignment Act would normally pro-

hibit assignments of this nature, plaintiff contends the contracting officer acted within his authority by waiving the Act's requirements and recognizing the assignments. Defendant was therefore bound by the terms of the assignments and must be held liable for its failure to fulfill its obligations under them.

Defendant admits it may recognize an assignment but before an assignment can be recognized, it insists the assignee must comply with the specific notice provisions applicable to banks and other financial institutions when such institutions, in conjunction with financing the work of Government contractors, seek to have the proceeds due under the contracts assigned to them. The Act provides that a bank or other financing institution must file a written notice of the assignment with the contracting officer and the disbursing officer, if any, designated in the contract to make payment. Here, defendant argues, it is undisputed that Winchester, whatever notice it gave to the contracting officer, never provided him with a true copy of the instrument of assignment. Because the notice provisions as set forth by the statute applicable to the banks and financial institutions were not followed, the contracting officer was wholly without authority to recognize the assignments, in defendant's view.

As a subsidiary point, defendant also seems to argue a real question exists as to whether the contracting officer actually intended to recognize or acknowledge the assignments. Defendant does not deny the contracting officer possessed knowledge of the assignments but theorizes his acknowledgement of such may have been merely tentative or conditional upon receipt of a copy of the true instrument of assignment.

After careful examination of the facts of this case, we conclude the contracting officer was fully aware of the assignments, recognized them, and communicated such recognition to plaintiff. In this case the action of defendant constituted a waiver of

---

**3.** According to plaintiff there is little hope of ever recovering any amount from Gradsky since in post-judgment depositions Gradsky has claimed a negative net worth of $800,000, including $410,000 owed to the Government in back taxes.

the Act's provisions, including the notice provision applicable to banks and financial institutions. Having chosen to recognize the assignments, defendant was bound to act in accordance with their terms.

Before discussing the specific facts which lead us to these conclusions it is appropriate, at this juncture, to establish the legal context in which this case arises. The anti-assignment statutes, 31 U.S.C. § 203 and 41 U.S.C. § 15 [4] invalidate transfers of contracts and assignments of claims against the Government.[5] The statutes serve two purposes. They are primarily intended "to prevent persons of influence from buying up claims against the United States, which might then be improperly urged upon officers of the Government," *Spofford v. Kirk*, 97 U.S. 484, 490, 24 L.Ed. 1032 (1878). Second, it is inferred Congress sought to enable the United States "to deal exclusively with the original claimant instead of several parties," thereby eliminating the confusion of conflicting demands for payment and the chances of multiple liability. *Patterson v. United States*, 354 F.2d 327, 173 Ct.Cl. 819 (1965).

Shortly after their enactment the statutes were strictly construed to invalidate nearly all assignments. Over time, the courts, sensitive to the purposes of the statutes, exempted from their broad reach certain assignments when it was concluded assignment did not present the danger the

---

4. The statutory prohibition against the assignment of *claims* is contained in 31 U.S.C. § 203 (1976). The prohibition against the assignment of *contracts* is found in 41 U.S.C. § 15 (1976) which provides in part:

> "No contract or order, or any interest therein, shall be transferred by the party to whom such contract or order is given to any other party, and any such transfer shall cause the annulment of the contract or order transferred, so far as the United States are concerned. All rights of action, however, for any breach of such contract by the contracting parties, are reserved to the United States.
>
> The provisions of the preceding paragraph shall not apply in any case in which the moneys due or to become due from the United States or from any agency or department thereof, under a contract providing for payments aggregating $1,000 or more, are assigned to a bank, trust company, or other financing institution, including any Federal lending agency: *Provided*, 1. That in the case of any contract entered into prior to October 9, 1940, no claim shall be assigned without the consent of the head of the department or agency concerned; 2. That in the case of any contract entered into after October 9, 1940, no claim shall be assigned if it arises under a contract which forbids such assignment; 3. That unless otherwise expressly permitted by such contract any such assignment shall cover all amounts payable under such contract and not already paid, shall not be made to more than one party, and shall not be subject to further assignment, except that any such assignment may be made to one party as agent or trustee for two or more parties participating in such financing; 4. That in the event of any such assignment, the assignee thereof shall file written notice of the assignment together with a true copy of the instrument of assignment with (a) the contracting officer or the head of his department or agency; (b) the surety or sureties upon the bond or bonds, if any, in connection with such contract; and (c) the disbursing officer, if any, designated in such contract to make payment.
>
> Notwithstanding any law to the contrary governing the validity of assignments, any assignment pursuant to this section, shall constitute a valid assignment for all purposes."

The conceptual difference between the statutes is that 31 U.S.C. § 203 pertains to claims for work already done while 41 U.S.C. § 15 involving executory contracts, is more concerned with continuing obligations. Furthermore, 41 U.S.C. § 15 expressly provides that an attempted assignment "shall cause the annulment of the contract or order transferred"; 31 U.S.C. § 203, in contrast, states an attempted assignment of a claim shall be "absolutely null and void." In light of this distinction the court in *Colonial Navigation v. United States*, 181 F.Supp. 237, 149 Ct.Cl. 242 (1960) held that an attempt to assign a claim whose assignment is prohibited by 31 U.S.C. § 203 does not forfeit the claim.

The present case, of course, deals with 41 U.S.C. § 15. Some of the cases cited in the discussion, *infra*, of assignment principles, arose under 31 U.S.C. § 203. In general terms, however, the concerns of the two statutes and the legal concepts involved in their applicability are the same.

5. Actually, it has been said 41 U.S.C. § 15 does not "act as a self-executing nullification in cases where government contracts are assigned, but merely enables the government at its option to annul assigned contracts." *Thompson v. Commissioner*, 205 F.2d 73, 78 (3rd Cir. 1953).

statutes were designed to obviate. Accordingly, the courts have held selected assignments to be by operation of law and exempt from the statutes' prohibition, such as transfers by interstate succession or testamentary disposition, *Erwin v. United States*, 97 U.S. 392, 24 L.Ed. 1065 (1878); by judicial sale, *Western Pacific R.R. Co. v. United States*, 268 U.S. 271, 45 S.Ct. 503, 69 L.Ed. 951 (1925); or by subrogation to an insurer, *United States v. Aetna Casualty & Surety Co.*, 338 U.S. 366, 70 S.Ct. 207, 94 L.Ed. 171 (1949). Perhaps the most significant exception to the statutes recognized thus far is when transfer of a claim or contract is effected by consolidation or merger to the successor of a claimant corporation. *Seaboard Air Line Ry. v. United States*, 256 U.S. 655, 41 S.Ct. 611, 65 L.Ed. 1149 (1921); *see Consumer's Ice Co. v. United States*, 475 F.2d 1161, 201 Ct.Cl. 116 (1973); *I.T.T. Gilfillan, Inc. v. United States*, 471 F.2d 1382, 200 Ct.Cl. 367 (1973).

■ Consistent with the situations in which the Anti-Assignment Act has been deemed inapplicable stands the long-recognized principle that "Despite the bar of the Anti-Assignment statute (41 U.S.C. § 15), the Government, if it chooses to do so, may recognize an assignment." *Maffia v. United States*, 163 F.Supp. 859, 862, 143 Ct.Cl. 198, 203 (1958); *G. L. Christian & Assoc. v. United States*, 312 F.2d 418, 423, 160 Ct.Cl. 1, 10, *cert. denied*, 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963). The strength of this principle is established not only by its age [6] but by its adoption throughout the various forums which rule on Government contract controversies.[7]

■ While today it is agreed that the Government may recognize an assignment it is unclear precisely what actions by the Government will constitute recognition. The soundest and most accepted method of establishing recognition by the Government is for all three parties to enter into a novation agreement.[8] Novation, however, is not the exclusive method of establishing recognition, for in instances where the Government's course of conduct, its statements to the parties and its dealings with the assignee indicate it acknowledges the assignee as the contractor, recognition has been found, *see G. L. Christian & Assoc. v. United States, supra; Poorvu v. United States*, 420 F.2d 993, 190 Ct.Cl. 640 (1970). We thus arrive at the specific question of whether in this case the actions of the Government, manifested primarily by the contracting officer, Scroggs, indicated its consent to and recognition of the assignments.

■ The facts before us provide ample support for the conclusion the Government was aware of, assented to, and recognized the assignments. Prior to each assignment both Winchester and Grant contacted Scroggs for his advice on the validity of the proposed assignments. They were assured by Scroggs that despite the Anti-Assignment Act, the assignments were proper and would be recognized by HUD, with payment going to Winchester as contemplated.

Immediately after contract H-3154 was assigned to Winchester both Grant and Winchester sent Scroggs written notification of the assignment. Specifically, Winchester sent five copies of the notice of assignment to Scroggs with a cover letter stating, in part, "We look forward to working with you in furnishing this emergency housing."

---

6. *Thompson v. Commissioner*, 205 F.2d 73, 78 (3rd Cir. 1953); *Federal Mfg. & Printing Co. v. United States*, 41 Ct.Cl. 318, 321 (1906); 16 Op.Atty.Gen. 277 (1879); 15 Op.Atty.Gen. 235, 245-46 (1877).

7. *Radiatronics, Inc.*, ASBCA 15133, 75-2 BCA ¶ 11,349 (1975). "It is well settled that the Government may waive 41 U.S.C. § 15"; *see Vertical Aviation Transport Systems, Inc.*, ASBCA 18266, 74-1 BCA ¶ 10,617 (1974). Comptroller General Decision B-174314, August 28, 1973; Comptroller General Decision B-192354, November 29, 1978.

8. The Federal Procurement Regulations 1-26.4 [41 C.F.R. § 1-26.4 (1973)] contain detailed directions concerning execution of novation agreements. *See also I.T.T. Gilfillan, Inc. v. United States*, 471 F.2d 1382, 1384, 200 Ct.Cl. 367, 369-70 (1973); Comptroller General Decision B-174314, August 28, 1973.

Again, after assignment of contract H–3341, Grant, by Gradsky's letter dated August 11, 1973, notified Scroggs that Grant had "assigned all of our right, title and interest to receive payment" under the contract to the Atlanta firm of McClain, Millen, Bowling & Hickman, which was to act as disbursing agent for the funds. Scroggs wrote "Assignment acknowledged" with his signature and the date 8/15/72, at the bottom of this letter.

Given the earlier contact Winchester and Grant had with Scroggs and the advice he gave, it is difficult to see how Scroggs' signed acknowledgement was anything other than assent to the arrangement. Any doubts on this score are dispelled by the Government's actions consistent with its demonstrated awareness and acknowledgement of the assignments. The mobile homes were manufactured and delivered to HUD by Winchester and *accepted by HUD.* Perhaps most significantly, HUD on September 7, 1972, *made to Winchester* the first and by far the largest, $300,457.80, of ten payments under contract H–3154. Payments totalling $76,631.10 were *made to the law firm* under contract H–3341.[9]

It is unnecessary to identify any one particular act as constituting recognition of the assignments by the Government. It is enough to say that the totality of the circumstances presented to the court establishes the Government's recognition of the assignments by its knowledge, assent, and action consistent with the terms of the assignments. Plaintiff's case might have been enhanced had it demonstrated as extensive a course of dealing between the Government and the assignee as in *G. L. Christian & Assoc., supra.* Nevertheless, the facts of this case are sufficiently comparable to *G. L. Christian & Assoc.* to support a similar legal conclusion.

■ The foregoing discussion does not address directly the Government's main argument that before the contracting officer has authority to recognize an assignment the assignee must comply with the notice

provisions applicable to financing institutions. The argument is novel indeed for as often as this court has stated the Government may waive the Anti-Assignment Act and recognize an assignment, it has never intimated waiver of the Act is nevertheless conditional upon fulfillment of certain provisions of the Act. Recognition encompasses waiver of the entire Act; recognition of an assignment is not, as the defendant argues, simply another exception to the Act, as assignment to a financing institution. Reduced to its fundamental point, the Government's argument is that compliance with the notice provisions applicable to banks and financing institutions is the *exclusive* method of avoiding the Act's prohibition. The cases cited in the court's discussion, *supra,* demonstrate that such an assertion is incorrect.

In more general terms it might be asked whether the contracting officer, as the Government's representative, had authority to recognize the assignment. It is clear he possessed this basic authority. *See Maffia v. United States,* 163 F.Supp. 859, 862, 143 Ct.Cl. 198, 204 (1958).

■ Defendant also contends plaintiff's claim should be barred by the equitable doctrine of laches, because plaintiff's petition was filed just one day short of the six-year statute of limitations. While defendant acknowledges that the Court of Claims has never applied the defense of laches in a contract suit, defendant urges us to apply laches here because plaintiff's delay has prejudiced the Government's chances of collecting from Gradsky. Given the facts of the case, defendant's recognition of the assignments, yet its failure to act consistent with their terms, we conclude defendant's invocation of the laches doctrine is not supportable. He who seeks equity must do equity, *Koster v. Lumbermens Mutual Casualty Co.,* 330 U.S. 518, 522, 67 S.Ct. 828, 91 L.Ed. 1067 (1947); 30 C.J.S. Equity § 90 (1965). Plaintiff's claim, timely filed, is not barred by laches.

---

**9.** If, as defendant argues, the payments to Grant were valid, it might well be asked under what authority did the Government advance payments to Winchester and the law firm?

One further issue remains for disposition. Shortly after oral argument defendant submitted its "Motion to Strike the Affidavit of Plaintiff's Attorney or, in the Alternative, for Leave to File Counter Affidavits." In this motion defendant claims it was misled by an affidavit at the conclusion of plaintiff's brief in which plaintiff's attorney swore to the truth of all statements of fact in the complaint and the brief. Defendant argues it thought this paragraph statement was merely a verification of the pleadings, not a statement which turned the entire brief into an affidavit. Defendant requests the affidavit either be stricken or it be given the opportunity to file counter affidavits. Otherwise, defendant argues, its case will be disadvantaged by the presence of plaintiff's unchallenged affidavit. Defendant also complains plaintiff's affidavit is ethically improper because plaintiff's attorney has become a witness in the case.

Defendant's motion to strike plaintiff's affidavit, or in the alternative, to file counter affidavits, must be denied. In the first place the court does not look favorably upon this unilateral effort by defendant tantamount to reopening evidence in the case after defendant moved for summary judgment and after oral argument. Filing post-argument briefs is one thing, but seeking to submit additional evidence after the case has come before the court on motions for summary judgment is quite another.

■ In any event, defendant is not disadvantaged by denial of its motion, for in finding the facts of this case the court relies only upon the facts as set forth in *plaintiff's complaint* and in *defendant's submissions*. Instead of answering the allegations of plaintiff's complaint by admission or denial, defendant filed its motion for summary judgment asserting there was no genuine issue as to any material fact; defendant's motion controverted none of the factual allegations of plaintiff's complaint. Recognizing the somewhat irregular style of plaintiff's affidavit, we have relied only on the facts as set forth in the complaint, undisputed by defendant, and in defendant's submissions.

■ The sum plaintiff seeks to recover against the United States is $111,895.86, the judgment entered by the United States District Court for the Eastern District of Tennessee, Southern Division, for Winchester against Grant and Gradsky. That judgment includes $17,068.86 as interest from December 14, 1972, to the date of judgment (December 4, 1974). Interest is not recoverable against the United States in the Court of Claims absent a statute, regulation, or contractual provision providing for such, 28 U.S.C. § 2516(a) (1976); *Cleveland Chair Co. v. United States*, 557 F.2d 244, 214 Ct.Cl. 360 (1977). Therefore, that portion of the judgment representing interest must be deducted in calculating the award of this court.

In summary, the court holds that because defendant had knowledge of, assented to, and recognized the assignment of contracts H–3154 and H–3341 from Grant to Winchester, it is liable for the losses sustained by plaintiff resulting from the payments made to Grant in contravention of the terms of the assignments. Plaintiff's claim is not barred by laches. The amount awarded excludes any sum for interest.

Accordingly, upon the parties' submissions and after oral argument, plaintiff's motion for summary judgment is granted and defendant's motion for summary judgment is denied. Defendant's motion for leave to file out of time its "Motion to Strike the Affidavit of Plaintiff's Attorney or, in the Alternative, for Leave to File Counter Affidavits" is granted. The motion itself on the merits, to strike the affidavit of plaintiff's attorney or, in the alternative, to file counter affidavits, is denied. Judgment is entered for plaintiff in the sum of $94,827.00.