ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| Trinity Source Logistics LLC[1] | )  ASBCA No. 62435 |
| | ) |
| Under Contract No. H92277-18-P-0014 | ) |

APPEARANCE FOR THE APPELLANT:      Ary Atrushi, Esq.
                                                                    Germantown, MD

APPEARANCES FOR THE GOVERNMENT:   Jeffrey P. Hildebrant, Esq.
                                                                    Deputy Chief Trial Attorney
                                                                    Lawrence M. Anderson, Esq.
                                                                    Trial Attorney

OPINION BY ADMINISTRATIVE JUDGE HERZFELD ON THE
GOVERNMENT'S MOTION TO DISMISS AND APPELLANT'S
CROSS-MOTION FOR SUMMARY JUDGMENT

The appellant seeks payment from the Department of the Air Force (Air Force) for work successfully performed on a contract to provide school and teaching supplies for children in Syria.  The Air Force moves to dismiss this appeal, asserting that the government entered a contract with a United States-based company with the same name, appellant did not have a contract with the United States government, and, thus, this Board lacks jurisdiction to hear this appeal.  Appellant cross-moves for summary judgment contending that the Air Force contracted with appellant, which partially performed the contract, and not the United States-based company.  For the reasons discussed below, we grant the Air Force's motion to dismiss and deny appellant's cross-motion.

STATEMENT OF FACTS FOR PURPOSES OF THE MOTION

On October 4, 2017, Nasrin Yamolky registered "Trinity Logistics Source" in the Joint Contingency Contracting System (JCCS) using her yahoo email address (R4, tabs 1, 6).

On October 7, 2017, Ms. Yamolky filed articles of incorporation for Trinity Logistics Source Inc. (Trinity-US) with the State of Washington's Secretary of

---

[1] Although our caption states that "Trinity Source Logistics" is the appellant, appellant actually is "Trinity Logistics Source."  The parties agree that the government awarded a contract to a company named "Trinity Logistics Source."

State's office (gov't mot., attach. 1).  Ms. Yamolky listed herself as the contact, the company's contact address in Lynnwood, Washington, and a Gmail address (*id.*).

On January 21, 2018, Mala Amin Mala Amin Haji and Nasrin Kamal Amin (each 50% shareholders) incorporated Trinity Logistics Source Company (Trinity- Iraq) in Erbil, Iraq (app. supp. R4, tab 1 at 1, 4).  Trinity-Iraq's board meeting minutes appointed Mr. Mala as "executive manager" and granted him exclusive authority to sign contracts, open bank accounts, and act as power of attorney for the company (*id.* at 1).  Appellant is Trinity-Iraq.

Trinity-Iraq asserts that Nasrin Kamal Amin – the 50% owner of Trinity- Iraq – is the same person as the owner of Trinity-US, Ms. Nasrin Yamolky (app. opp'n & cross-mot. at 2 n.1).  The Air Force disputes whether Ms. Yamolky is Nasrin Kamal Amin, but asserts that it is not relevant for purposes of the cross-motions (gov't opp'n & reply at 6-7).  Thus, for purposes of the cross-motions, we will treat Ms. Yamolky as the same person as Nasrin Kamal Amin.

On March 30, 2018, the government released a draft of request for quotations No. H92277-18-T-0004 (the Solicitation) and notified Ms. Yamolky (R4, tab 2).  On April 5, 2018, the government issued the Solicitation requesting quotations to "provide prepacked backpacks, prepacked teacher kits and classroom furniture for children and teachers in Syria" (R4, tab 5 at 1, 6); *Najmaa Alshimal Co.,* ASBCA No. 62701, 21-1 BCA ¶ 37,872 at 183,898.

On April 11, 2018, Ms. Yamolky submitted a quotation on behalf of "Trinity Logistics Source" (R4, tab 3).  Ms. Yamolky listed herself as "CEO," listed the same yahoo email address she used to register with the JCCS, an additional email address at trinity-source.com, and listed the company's address as 100m Road, Erbil, Iraq (*id.* at 2).[2]  Trinity Logistics Source submitted a best and final offer on May 3, 2022 (R4, tab 4).

---

[2] Trinity-Iraq repeatedly asserts that the proposal was submitted on September 30, 2017, but it only cites the quotation submitted on April 11, 2018 (app. opp'n & cross-mot. at 3; app. reply at 4-5).  Yet, the government did not issue the Solicitation until April 5, 2018 (R4, tab 5).  Thus, we find no support for Trinity-Iraq's assertion.

The government awarded Contract No. H92277-18-P-0014 (Contract) for these services to:

> Trinity Logistics Source
> Nasrin Yamolky
> 100M Road
> Erbil

(R4, tab 7 at 2, 3). On May 18, 2018, Ms. Yamolky signed the Contract as the CEO of the awardee (*id.* at 2).

On June 1, 2018, Ms. Yamolky wrote the government's contract specialist, requesting that the government change the DUNS number/cage code and company address in the Contract to the Washington state address of Trinity-US because "the headquarter is in the USA" (R4, tab 8 at 2-4). On June 4, 2018, Ms. Yamolky explained why she requested the change, "[T]here is an issue that a company here in Erbil is claiming that this contract is belong to them it's also called trinity logistic, and now they trying to steel that contract and its is now in Erbil court, that's why I want you to make this adjustment and show it to the judge" (*id.* at 2).

On June 22, 2018, Mr. Mala and Ms. Yamolky (referred to as "Nasrin Kamal Amin") entered a "Contract Agreement and Finalizing Sharing" agreement, in which Mr. Mala purchased Ms. Yamolky's share of Trinity-Iraq for $100,000 to be paid on September 15, 2018 (app. supp. R4, tab 3 at 1, 3). The agreement stated that Mr. Mala would "carry out and owning the project" (*id.* at 1). The settlement agreement identified the project as the Contract (*id.*). The agreement also required Ms. Yamolky to provide the domain and website of the company to Mr. Mala, require the use of a Kurdistan bank account for payments under the Contract, and provide Mr. Mala with all prior emails and contact information regarding the Contract (*id.* at 2).

On June 23, 2018, Ms. Yamolky communicated with a government representative regarding logistics for the delivery of supplies under the Contract (app. opp'n & cross-mot., ex. B).

On June 25, 2018, Mr. Mala entered several subcontract agreements for the supplies to provide under the Contract (app. supp. R4, tab 4). On July 31, 2018, Mr. Mala – identifying himself as CEO – signed the first modification to the Contract, which added a contract line item number to pay for transportation services (R4, tab 9 at 1). Also on July 31, 2018, Trinity Logistics Source delivered the supplies under the Contract and submitted an invoice for $1,690,680 to the government for the supplies, listing Mr. Mala as the "CEO" of the company and Mohsen Jawar as the "COO" (R4, tab 10). The invoice used the 100m Road, Erbil, Iraq address, sometimes referring to it as "100m st" (*id.* at 1). Ms. Yamolky's name does not appear on the invoice.

3

On September 4, 2018, the government issued its Material Inspection and Receiving Report (DD250), formally accepting the supplies delivered on July 31, 2018 (R4, tab 11).

On October 13, 2018, Ms. Yamolky contacted the government's contracting officer to inquire regarding payment under the Contract (R4, tab 14 at 3). In response to the government's request for a bank account, Ms. Yamolky provided Trinity-US's Washington-based bank account information (*id.* at 2).

On October 17, 2018, a government representative responded to Ms. Yamolky:

> The invoice that was provided has a[] different Bank Name and information. Are there two different companies and if so how are they related and which bank is the correct bank account to send the payment to? Please resend a[] new invoice with the bank that you want payment sent to. We just want to make sure that it goes to the correct location.

(*Id.*). Internally on October 22, 2018, the government acknowledged, "We are having a hard time identifying who is the current owner and has the signing authority of Trinity Logistics to receive payment. We are trying to get them paid but there is a[] conflict between the old owner and the new one" (R4, tab 13 at 33). On the same day, the government also informed Mr. Mohsen of Trinity-Iraq that "apparently there's an issue with the previous owner and the current owner of Trinity Logistics, that's why the payment has not been made" (*id.* at 16).

On November 6, 2018, the government informed Mr. Mohsen of Trinity-Iraq that the Inspector General, Federal Bureau of Investigation, and Iraqi Criminal Investigation Division were investigating because there were "other people trying to collect payment" (*id.* at 4-5). On November 7, 2018, the government recommended Mr. Mohsen "file a claim against the US Government for services render/items delivered" (*id.* at 1).

On March 3, 2019, the Washington Secretary of State dissolved Trinity-US as inactive based on failing to file its annual report (gov't mot., attach. 3).

On April 21, 2019, Ms. Yamolky informed the government that she and Mr. Mala "have settled our issues and no longer have any problem" (app. supp. R4, tab 7). Ms. Yamolky requested that the government pay Mr. Mala for the performance of the Contract (*id.*).

On October 25, 2019, Trinity-Iraq submitted a certified claim to the government for $1,690,680 (R4, tab 17).

4

On October 31, 2019, the Judicial Council, Court of First Instance, in Erbil, Iraq, issued a decision that dismissed the Iraqi lawsuit brought by Mr. Mala against Ms. Yamolky based on the June 22, 2018 agreement (discussed above) (app. opp'n & cross-mot., ex. J).

On December 23, 2019, the government issued a contracting officer's final decision, which denied Trinity-Iraq's claim "on the grounds that the claimant has provided insufficient evidence to establish that it is the contractor to whom the government awarded the contract at issue" (R4, tab 21 at 2).

On March 9, 2020, Trinity-Iraq appealed the contracting officer's final decision to this Board.

On August 16, 2021, counsel for Mr. Mala contacted Ms. Yamolky and suggested, "A possible solution to the case could be assignment. It is detailed in FAR 32.805" (gov't opp'n & reply, Declaration of Ian Somerville, ex.). Ms. Yamolky forwarded this email to Air Force counsel and asked to let her "know what is the solution in regard [to] this contract" (*id.*). And, after a response from the Air Force disclaiming any ability to give legal advice, she clarified that she just sought "an update regarding this contract and payment" and why "payment has not issued yet" (*id.*). Finally, as part of briefing the cross-motions, Trinity-Iraq submitted an affidavit from Ms. Yamolky stating Trinity-US was withdrawing "any and all claims made or purported to have been made for payment" under the Contract and that the government should pay Trinity-Iraq (app. reply, ex. 3, Nasrin Yamolky aff.).

DECISION

The government contracted with Trinity-US to perform the Contract. Trinity-Iraq completed performance for Trinity-US and now seeks payment based on the assignment of the Contract or the claim for the Contract price. However, Trinity-US and Trinity-Iraq have failed to follow the required procedures for assigning any money due under the Contract and the subsequent claim. Thus, because Trinity-Iraq had no privity of contract with the government, we do not possess jurisdiction of Trinity-Iraq's appeal.

I.      *Standards of Review*

Trinity-Iraq, as the proponent of the Board's jurisdiction, bears the burden of establishing jurisdiction by a preponderance of the evidence. *Najmaa Alshimal,* 21-1 BCA ¶ 37,872 at 183,899; *see also K-Con Bldg. Sys., Inc. v. United States,* 778 F.3d 1000, 1004 (Fed. Cir. 2015). "The facts supporting jurisdiction are subject to our fact-finding upon a review of the record." *CCIE & Co.,* ASBCA Nos. 58355, 59008, 14-1 BCA ¶ 35,700 at 174,816.

Board Rule 7(c) permits summary judgment motions and "looks to Rule 56 of the Federal Rules of Civil Procedure for guidance." ASBCA Rule 7(c)(2). FED. R. CIV. P. 56 requires granting "summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986).

## II.     *The Government Originally Contracted with Trinity-US, not Trinity-Iraq*

This Board's jurisdiction emanates from the Contract Disputes Act (CDA). 41 U.S.C. § 7105(e)(1)(A) ("The Armed Services Board has jurisdiction to decide any appeal from a decision of a contracting officer of the Department of Defense, the Department of the Army, the Department of the Navy, the Department of the Air Force, or the National Aeronautics and Space Administration relative to a contract made by that department or agency."). The CDA applies "only to 'contractors,' i.e., 'part[ies] to a Government contract other than the Government . . . .'" *Winter v. FloorPro, Inc.,* 570 F.3d 1367, 1370 (Fed. Cir. 2009) (citing 41 U.S.C. § 601(4), *recodified at,* 41 U.S.C. § 7101(7)). Generally, "those who are not in privity of contract with the government cannot avail themselves of the CDA's appeal provisions." *Id.* at 1371.

Here, looking at the evidence presented by the parties, we conclude that the government contracted with Trinity-US, owned by Ms. Yamolky, not Trinity-Iraq, owned by Mr. Mala (but once partially owned by Ms. Yamolky). In any express or implied-in-fact contract, we look to the mutuality of intent of the parties, among other things, to demonstrate the formation of a contract between a contractor and the Federal government. *Am. Bankers Ass'n. v. United States,* 932 F.3d 1375, 1380 (Fed. Cir. 2019); *ASFA Constr. Indus. & Trade, Inc.,* ASBCA No. 57269, 15-1 BCA ¶ 36,034 at 176,004.

The evidence demonstrates that Ms. Yamolky, as owner of Trinity-US, and the government formed a contract. From March 30, 2018, at the formation stage and until Ms. Yamolky entered her agreement with Mr. Mala in June 2018, the government only interacted with Ms. Yamolky. On March 30, 2018, the government notified Ms. Yamolky about the contract opportunity prior to the issuance of the Solicitation (R4, tab 2). On April 11, 2018, Ms. Yamolky submitted a quotation on behalf of "Trinity Logistics Source," listed herself as the CEO, and used the same yahoo email address she had used to correspond with the government and register the company in the JCCS (R4, tab 3 at 1-2). Ms. Yamolky signed the Contract as the CEO of "Trinity Logistics Source, Nasrin Yamolky" (R4, tab 7 at 2). In June 2018, Ms. Yamolky also communicated with the government regarding logistics for delivering the supplies under the Contract (app. opp'n & cross-mot., ex. B). The only hint the government had that another contractor might be involved was when Ms. Yamolky claimed an

6

Erbil, Iraq contractor had sued her in Iraq in an effort to steal the contract from Ms. Yamolky's Trinity-US company in June 2018 (R4, tab 8 at 1-2). The government heard nothing further regarding this litigation and continued to believe it was contracting with Ms. Yamolky's Trinity-US company until Trinity-Iraq claimed it was the contractor when it sought payment after delivery of the supplies under the Contract (R4, tab 13 at 33; tab 14 at 2). Thus, the mutual intent of the parties resulted in forming a contract between Trinity-US as the "contractor" and the government.

Trinity-Iraq asserts this is incorrect, and the government should have understood that Trinity-Iraq was the contractor (app. opp'n & cross-mot. at 10-14). Trinity-Iraq points to the Erbil, Iraq address on the Contract (instead of Trinity-US's Washington state address) and Mr. Mala's signature on a contract modification as evidence of the parties' intent. Trinity-Iraq looks for support to a decision from the U.S. Court of Federal Claims, *General Dynamics Corp. v. United States,* 47 Fed. Cl. 514 (2000). Although we may find the reasoning of that court's decisions persuasive, we are not bound by them. *Northrop Grumman Corp.,* ASBCA No. 62165, 21-1 BCA ¶ 37,922 at 184,176 n.8 ("[P]ublished decisions of the Court of Federal Claims are likewise neither binding upon this tribunal, nor are they even binding in other matters pending before the Court of Federal Claims.").

In any event, *General Dynamics* does not support Trinity-Iraq's position. There, the government was in the shoes of Trinity-Iraq, asserting that the government had intended to contract with Electric Boat, a division and then subsidiary of General Dynamics, because the contract used Electric Boat's address in the contract and Electric Boat had signed contract modifications on behalf of General Dynamics. 47 Fed. Cl. at 527-31. The court rejected those contentions, concluding that "[t]he significance of the address that followed in the box [on the contract form] was in identifying the Electric Boat design yard in Groton, Connecticut, as the GDC facility where the contract was to be performed." *Id.* at 530. And, even though representatives of Electric Boat negotiated modifications of the contract on behalf of General Dynamics, the contract modifications continued to reference General Dynamics as the contractor. *Id.* at 530-31. Here, as in *General Dynamics*, the parties (and particularly the government) understood that the address used in the Contract constituted the place of performance and understood it was contracting with Ms. Yamolky's Trinity-US (R4, tab 3 at 1-3 (quotation); tabs 1, 6 (JCCS registration to Ms. Yamolky); tab 7 at 2 (Contract), tabs 13-14). And, the modification continued to refer to the contractor as "Trinity Logistics Source, Nasrin Yamolky" (R4, tab 9 at 1). Indeed, the government sent the modification to Ms. Yamolky, not Mr. Mala (app. opp'n & cross-mot., ex. D). Just as in *General Dynamics,* where the government continued negotiating with Electric Boat personnel despite General Dynamics continuing as the contracting party, the government did not take note that Mr. Mala (rather than Ms. Yamolky) signed the modification, which occurred on the same day the supplies were delivered under the Contract (R4, tabs 9-10).

Trinity-Iraq asserts that Ms. Yamolky was acting on behalf of Trinity-Iraq in her actions in bidding on and executing the Contract (app. opp'n & cross-mot. at 3-4). However, Ms. Yamolky signed the Contract as the CEO – a position she held with Trinity-US, but not with Trinity-Iraq (gov't mot., attach. 2 at 2). Mr. Mala was the CEO of Trinity-Iraq. And, Ms. Yamolky could not have signed documents on behalf of Trinity-Iraq, because Trinity-Iraq's incorporation documents establish that only Mr. Mala could legally bind the company (app. supp. R4, tab 1 at 1). In this same vein, Trinity-Iraq also attaches several invoices signed by Ms. Yamolky in October and November 2017 as proof that she was signing those documents on behalf of Trinity-Iraq, and not Trinity-US (app. opp'n & cross-mot., ex. M). However, Trinity- Iraq was not incorporated until January 2018 (app. supp. R4, tab 1), while Trinity-US was incorporated in October 2017 (gov't mot., attach. 1-3). Thus, Ms. Yamolky appears to have signed all these documents as the CEO of Trinity-US, not Trinity-Iraq.

Trinity-Iraq also asserts that the government should have realized that Trinity- US (1) was not the proper company based on registering as a U.S. company in the JCCS, which Trinity-Iraq asserts was only required of non-U.S. companies; and (2) even if proper, the Solicitation did not require registration (app. opp'n & cross-mot. at 15). First, JCCS "is an internet-based information technology platform used by the government to provide centralized vendor registration, post solicitations and proposals, and provide other support to contingency and expeditionary programs that rapidly deploy for humanitarian, peacetime, and wartime missions . . . ." *Elizabeth Constr. Co.,* ASBCA No. 60723, 17-1 BCA ¶ 36,839 at 179,519. Contrary to Trinity-Iraq's assertion, the system also requires some U.S.-based companies to register if they will perform in a contingency area. JCCS NG Contract Office, *Vendor Vetting*, Slide 3 ("All Vendors and subcontractors seeking contracts and performing or delivering in the USCENTCOM AOR shall be vetted prior to receiving a contract with an estimated contract value above $50,000."); *id.* (exempting "U.S. publically traded companies" and Federal Supply Schedule vendors, but not all U.S. companies).[3] Indeed, the JCCS registration website permitted Trinity-US to enter the United States as the country address for the company (R4, tab 6 at 2). Second, even though the Solicitation did not include a specific clause requiring registration, the government required either JCCS or System for Award Management registration for this Solicitation, including specifically requiring contractors to provide that information during negotiations. *Najmaa Alshimal,* 21-1 BCA ¶ 37,872 at 183,898. Trinity-Iraq had no JCCS registration from contract formation through completion of performance, only Trinity-US did (R4,

---

[3] https://www.jccs.gov/jccsng/upload/documentTemplates/JCCS%20CENTCOM%20C ontract%20Office%20User%20Guide%2003%20%20Vendor%20Vetting%20B ackground.pdf (visited June 6, 2022).

tabs 6, 16). Thus, Trinity-US's JCCS registration does not assist Trinity-Iraq in proving that Trinity-Iraq had a contract with the government.

Trinity-Iraq contends that the June 22, 2018 "Contract Agreement and Finalizing Sharing" agreement between Mr. Mala and Ms. Yamolky proves that Trinity-Iraq was always the contractor, not Trinity-US (app. supp. R4, tab 3 at 1, 3). Trinity-Iraq asserts that the agreement purchased Ms. Yamolky's 50% interest in Trinity-Iraq and, because Trinity-Iraq was always the contractor, had no need to assign the Contract from Trinity-US to Trinity-Iraq (app. reply at 4). On the other hand, the Air Force asserts that the June 22 agreement was not simply a stock purchase agreement, but also acted as an agreement to improperly assign the Contract from Trinity-US to Trinity-Iraq (gov't opp'n & reply at 7-8, 18-19).

We think the June 22 agreement, while ambiguous, seems to support the government's position. The agreement identifies Ms. Yamolky as the "owner of American company foreign (**Trinity Logistics Source**)" and identifies Trinity-Iraq as the "local company" (app. supp. R4, tab 3 at 1) (emphasis in original). The June 22 agreement, as translated into English, further states: "[Mr. Mala] is going to buy all the other remaining share of local company (Trinity Logistics Source) from [Ms. Yamolky] and the same time [Mr. Mala] will carry out and owning the project," citing the Contract (*id.*). This language establishes that Mr. Mala purchased Ms. Yamolky's remaining shares in Trinity-Iraq and that Mr. Mala would now "carry out and own" the Contract, which appears to recognize that Trinity-Iraq did not previously own the Contract. Elsewhere, the agreement sets forth the transfer of various things to allow Mr. Mala's Trinity-Iraq to perform the Contract, including "providing (the domain and the website) of the company" (*id.* at 2). This reference is to the "company," which appears to be to Trinity-US, and not Trinity-Iraq, which the agreement usually (although not always) identifies as the "local company" such as later in this same clause of the agreement (*id.*) (stating that Ms. Yamolky "is not allowed to use th[is] above information after signing this contract except by request[] from [Mr. Mala] as an assistance because [Ms. Yamolky] does not have any right to this project and the *local company*" (emphasis added)). Moreover, the agreement requires Ms. Yamolky to provide all emails "added for the period of (15) days on the original days of carrying out the project" and "[p]roviding all the emails and the contact information which are specific for the **project**," which again implies the need to transfer the Contract beyond a stock purchase agreement (*id.*) (emphasis in original). Thus, we believe the agreement does not support Trinity-Iraq's contention that it always was the "contractor."

Finally, Trinity-Iraq asserts that, even if there was no express contract between Trinity-Iraq and the government, Trinity-Iraq had an implied-in-fact contract with the government (app. opp'n & cross-mot. at 16-17). "An agreement implied in fact is founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the

9

surrounding circumstances, their tacit understanding." *Hercules Inc. v. United States,* 516 U.S. 417, 424 (1996) (internal citation and quotation omitted). However, "[i]t is well settled that the existence of an express contract precludes the existence of an implied-in-fact contract dealing with the same subject matter, unless the implied contract is entirely unrelated to the express contract." *Lee v. United States,* 895 F.3d 1363, 1370 (Fed. Cir. 2018) (internal citations and quotations omitted). Here, Trinity-Iraq asserts there is a document expressing the mutuality of intent to contract (without citing which document it means) and that its Contract performance created an implicit contractual relationship (app. opp'n & cross-mot. at 16-17). To the extent that Trinity-Iraq relies on the modification signed by Mr. Mala, we have already addressed why that document does not express mutuality of intent by the government. Also, because both the modification and Trinity-Iraq's apparent completion of performance related to the express Contract between Trinity-US and the government, neither can serve as a basis for a separate implied-in-fact contract. *Lee,* 895 F.3d at 1370.

III.     *Trinity-US Failed to Effectively Assign any Money Due Under the Contract or Claims to Trinity-Iraq*

Although we have concluded that the government entered the Contract with Trinity-US and not Trinity-Iraq, Trinity-Iraq could also demonstrate it was the "contractor" for purposes of our jurisdiction if it could show that Trinity-US properly assigned the Contract and its claims to Trinity-Iraq or that the government has recognized the assignment. Here, however, Trinity-Iraq has failed to demonstrate that Trinity-US properly assigned the contract and the resulting claims to Trinity-Iraq.

Any assignment of claims or contracts must comport with the two anti-assignment statutes: (1) the Assignment of Claims Act, 31 U.S.C. § 3727; and (2) the Assignment of Contracts Act, 41 U.S.C. § 6305. *CBI Servs., Inc.,* ASBCA No. 34983, 88-1 BCA ¶ 20,430 at 103,337. "These two provisions together broadly prohibit . . . transfers of contracts involving the United States or interests therein, and assignment of claims against the United States." *Delmarva Power & Light Co. v. United States,* 542 F.3d 889, 892 (Fed. Cir. 2008) (quoting *Fireman's Fund Ins. Co. v. England,* 313 F.3d 1344, 1349 (Fed. Cir. 2002)). The statutes serve two purposes: (1) to prevent a person or entity from "buying up claims against the United States, which might then be improperly urged upon officers of the Government;" and (2) "to enable the United States 'to deal exclusively with the original claimant instead of several parties,' thereby eliminating the confusion of conflicting demands for payment and the chances of multiple liability." *Tuftco Corp. v. United States,* 614 F.2d 740, 744 (Ct. Cl. 1980) (quoting *Spofford v. Kirk,* 97 U.S. 484, 490 (1878) and *Patterson v. United States,* 354 F.2d 327, 329 (Ct. Cl. 1965)).

The Federal Acquisition Regulation (FAR) permits the assignment of a Federal government contract through novation, which requires the assignor, assignee, and the

government to enter a novation agreement. FAR 42.1204. "[A] successor in interest under a novation agreement, pursuant to which it is 'entitled to all the rights' of its predecessor as if it were 'the original party' to the contract, is recognized by the government as the successor in interest for all purposes, including the right to pursue any claims its predecessor could have pursued." *Cooper/Ports Am., LLC,* ASBCA No. 61461, 18-1 BCA ¶ 37,045 at 180,331. Trinity-Iraq asserts that a novation agreement was unnecessary because it always was the contractor, and the June 22 agreement only related to Mr. Mala's stock purchase of the remaining shares of Trinity-Iraq from Ms. Yamolky (app. reply at 4). Indeed, the FAR does not require novation if an ownership change occurs by stock purchase and the same entity continues performing the contract. FAR 42.1204(b) ("A novation agreement is unnecessary when there is a change in the ownership of a contractor as a result of a stock purchase, with no legal change in the contracting party, and when that contracting party remains in control of the assets and is the party performing the contract."). However, as discussed above, we believe the June 22 agreement was not simply a stock purchase agreement but also assigned the Contract and its proceeds from Ms. Yamolky's Trinity-US to Mr. Mala's Trinity-Iraq to perform. It did not qualify as a novation of the Contract, as the government was not a party to that agreement.

In its reply, Trinity-Iraq includes an affidavit from Ms. Yamolky "withdrawing any and all claims" to payment under the Contract and directing the government to pay Trinity-Iraq (app. reply, ex. 3). However, this falls short of the FAR's novation requirements. FAR 42.1204.[4] Also, Ms. Yamolky's withdrawal of claims did not serve to assign the claims. The Contract requires, among other things, that any assignment of claims must be "[a]pproved in writing by the Contracting Officer" and "[m]ade in accordance with the laws and regulations of the United States of America" (R4, tab 7 at 14) (incorporating by reference DFARS 252.232-7008(a)(1)-(2), ASSIGNMENT OF CLAIMS (OVERSEAS) (JUN 1997)). The FAR sets forth requirements for a contractor to provide notice and receive government acknowledgement and approval for an assignment of claims. FAR 32.805. Here, it appears that Trinity-Iraq's counsel and Ms. Yamolky communicated about potentially assigning the claims to resolve this dispute consistent with the FAR: "A possible solution to the case could be assignment. It is detailed in FAR 32.805" (gov't opp'n & reply, ex. attached to Declaration of Ian Saville). However, to date, apparently Mr. Mala's Trinity-Iraq and Ms. Yamolky have not attempted to assign the claim and

---

[4] Mr. Mala's signature on one modification also is insufficient to demonstrate a recognition of an assignment. *Morrison-Smith, Inc.,* ASBCA No. 38028, 90-1 BCA ¶ 22,308 at 112,027 (rejecting asserted assignment by alleged assignee where appellant "failed to prove that the contracting officer had notice, or was aware, that anyone other than an authorized representative of [original contractor] would sign the modification").

11

seek the contracting officer's approval consistent with the Contract and the FAR. As a result, the contracting officer still does not know which person or company the government should pay (gov't opp'n & reply, Declaration of Ian Somerville ¶ 7).[5] Thus, the Federal government risks double payment or multiple liability, precisely the concerns Congress intended the anti-assignment statutes to prevent. *Tuftco,* 614 F.2d at 744.

Finally, Trinity-Iraq asserts that its partial contract performance effectively negated the necessity for a novation agreement or constructively novated the Contract (app. reply at 4 n.1). Trinity-Iraq quotes one of our decisions, which states that "partial performance of a Government contract by an agent pursuant to a power of attorney does not connote or create an assignment and would not contravene the anti-assignment statute." *Mancon Liquidating Corp.,* ASBCA No. 18304, 74-1 BCA ¶ 10,470 at 49,515. However, as we stated in that decision's prior sentence: "To the extent that such actions may be construed to have been a partial performance of the two subject contracts, such actions were not tantamount to recognition of an assignment or novation of the contracts." *Id.* (internal citations omitted). We concluded that the partial performance by a company acting as the power of attorney did not result in any change in privity. *Id.* As here, the assignor, not the assignee, remained the "contractor" for purposes of our jurisdiction. *Id.* "As we have held previously, an assignment of proceeds arising from a government contract cannot establish or create a contractual relationship between the government and the assignee" (here, Trinity-Iraq). *Ham Investments, LLC,* ASBCA No. 55070, 06-2 BCA ¶ 33,406 at 165,631, *recon. denied,* 07-1 BCA ¶ 33,552. Thus, because Trinity-Iraq cannot demonstrate a proper novation occurred, it cannot show that it ever became the "contractor" for our jurisdictional purposes.

---

[5] Moreover, under the Assignment of Claims Act, the assignment "of money due or to become due," 31 U.S.C. § 3727(c), must be made "to a bank, trust company, or other financing institution, including any Federal lending agency." FAR 32.802(b); *Tiger Enters., Inc.,* ASBCA No. 57733, 13 BCA ¶ 35,265 at 173,125-126. The record does not contain any evidence that Trinity-Iraq meets this requirement.

CONCLUSION

For the foregoing reasons, we dismiss Trinity-Iraq's appeal for lack of jurisdiction. Accordingly, we do not have jurisdiction to decide appellant's cross-motion for summary judgment.

Dated: August 11, 2022

DANIEL S. HERZFELD
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 62435, Appeal of Trinity Source Logistics LLC, rendered in conformance with the Board's Charter.

Dated: August 12, 2022

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

13
