In re COMPUTER ENGINEERING ASSOCIATES, INC., Debtor.

John O. Desmond, Chapter 7 Trustee, and First Trade Bank, FSB, Plaintiffs,

v.

State Bank of Long Island, Advanced Testing Technologies, Inc., Eli Levi and Hector Gavilla, Defendants.

John O. Desmond, Chapter 7 Trustee, and First Trade Bank, FSB, Appellees/Counter–Appellant,

v.

State Bank of Long Island, Advanced Testing Technologies, Inc., Eli Levi and Hector Gavilla, Appellants/Counter–Appellees.

Bankruptcy No. 95–17971–JNF.
Adversary No. 97–1599.
Civ. Nos. 01–10131–REK,
01–10132–REK.

United States District Court,
D. Massachusetts.

March 15, 2002.

John O. Desmond, Framingham, MA, Kenneth A. Martin, Martin & Adams, PC, Washington, DC, Anthony L. DeProspo, Jr., Sherin & Lodgen, Christopher A. Kenney, Boston, MA, for Appellants.

David C. Phalen, Bartlett, Hackett, Feinberg, Gentilli, Liston, Brown & Phalen, PC, Frank F. McGinn, Bartlett Hackett Feinberg P.C., William R. Moorman, Craig & Macauley, P.C., Boston, MA, William J. Barrett, Gardner, Carton & Douglas, Chicago, IL, for Appellees.

## Opinion

KEETON, District Judge.

### I. Pending Appeals

Pending before the court are the following appeals from the judgment of the Bankruptcy Court issued on August 21, 2000:

(1) Advanced Testing Technologies, Inc.'s Appeal (attached to Docket No. 1 in Civil Action No. 01–10131–REK, filed January 25, 2001);

(2) First Trade Bank's Cross Appeal (attached to Docket No. 1 in Civil Action No. 01–10132–REK, filed January 25, 2001).

The two appeals are related and will both be considered in this Opinion.

The court notes that First Trade Bank has been referred to in filings as "First Trade Union Bank," "First Trade Union Savings Bank, FSB," as well as "First Trade Bank, FSB." The name "First Trade Bank, FSB" is used in the caption of this case as it was the name used in the Adversary Proceeding. *See In re Computer Engineering Associates,* 252 B.R. 253 (Bankr.D.Mass.2000).

### II. Other Pending Matters

Also pending before this court are the following motions:

(1) State Bank of Long Island's Motion to Dismiss Cross Appeal of First Trade Union Bank, FSB (Docket No. 23 in Civil Action No. 01–10132–REK, filed June 25, 2001);

(2) Advanced Testing's Motion for William Barrett to Appear Pro Hac Vice (Docket No. 28 in Civil Action No. 01–10132–REK, filed on July 23, 2001).

The court DENIES the Motion to Dismiss Cross Appeal in the Order below. The court has determined that the State Bank of Long Island ("State Bank") and the First Trade Bank ("First Trade") have conflicting interests in both appeals. As explained in this Opinion and during oral argument on July 23, 2001, the court has determined that this case must be remanded to the Bankruptcy Court. The court will therefore not dismiss State Bank from the cross appeal.

The court has already allowed a motion for William Barrett to appear Pro Hac Vice as to Civil Action No. 01–10131–REK. *See* Margin of Docket No. 18 in Civil Action No. 01–10131–REK. In the Order below, the court ALLOWS the Motion to Appear Pro Hac Vice in Civil Action No. 01–10132–REK.

### III. Issues on Appeal

The submissions of the parties identify numerous alleged issues on appeal. As explained by the court at oral argument, the parties have presented these issues less clearly than would have been possible, and in a somewhat repetitive manner. The court remains unconvinced that all of these issues were properly presented to the Bankruptcy Court. The court is also not convinced that a Final Judgment has been ordered by the Bankruptcy Court as to the division of proceeds between the Estate and First Trade.

668

The initial appeal was filed by Advanced Testing Technologies, Inc. ("ATTI"). ATTI appeals only the ruling of the Bankruptcy Court on Count IV of the Third Amended Complaint, namely, the Bankruptcy Court's holding that under 11 U.S.C. § 547 ATTI had received voidable preferential transfers within 90 days of CEA's filing for bankruptcy. ATTI submits that the "transfer," for purposes of 11 U.S.C. § 547, was the assignment of the contract payment rights, which assignment occurred outside of the 90–day preference period, and not the actual receipt of payments made pursuant to the assignment. Accordingly, ATTI submits that the Trustee could not establish the elements of a preference. *See Brief of Appellants,* Docket No. 4 at 3–4.

In its Cross Appeal, First Trade presents the following four contentions (*see* Brief of First Trade, Docket No. 16 at 2–3):

(1) that the Bankruptcy Court erred as a matter of law in ruling that First Trade did not have standing to pursue a claim to recover a voidable preference under 11 U.S.C. §§ 547 and 550;

(2) that the order of the Bankruptcy Court on Count IV of the Third Amended Complaint should be modified to provide that First Trade is entitled to recover the voidable preference in the amount of $1,241,511.07 received by ATTI from debtor Computer Engineering Associates, Inc. ("CEA");

(3) that the Bankruptcy Court erred as a matter of law with respect to the elements that First Trade was required to prove in order to establish its claim for conversion against ATTI; and

(4) that the Bankruptcy Court's order on First Trade's claim for conversion against ATTI should be reversed with directions that the Bankruptcy Court make

an order in favor of First Trade on Count II of the Third Amended Complaint.

Along with ATTI, First Trade, and CEA, the other named parties in these proceedings are the Chapter 7 Trustee (John Desmond), the State Bank of Long Island, Eli Levi, and Hector Gavilla. The caption refers to ATTI, State Bank, Eli Levi and Hector Gavilla as appellants/counter-appellees, and to First Trade and John Desmond as appellees/counter-appellants. As will become clear in this Opinion, these labels can be confusing as parties on the same side of the caption have conflicting views depending on the issue. The court will therefore refer to each party by name when stating the positions of the parties instead of using the term appellant or appellee.

### III. Legal Standard

 The court, in hearing an appeal, will generally give deference to the Bankruptcy Court's findings of fact unless clear error is demonstrated. *See Brandt v. Repco Printers & Lithographics, Inc.,* 132 F.3d 104, 108 (1st Cir.1997). The court will review de novo any rulings of law. *See LaRoche v. Amoskeag Bank,* 969 F.2d 1299, 1301 (1st Cir.1992). The court will also review de novo mixed questions involving application of a legal standard to a set of facts. *See Whitehouse v. LaRoche,* 277 F.3d 568, 573 (1st Cir.2002); *see also In re Pacific Gas and Electric Company,* 271 B.R. 626, 633–34 (N.D.Ca.2002). In this case, the predominant questions are mixed, with the parties generally agreeing with the Bankruptcy Court on its statement of facts and disputing the application of law to those facts.

The Bankruptcy Court conducted a bench trial and heard extensive testimony. The factual circumstances of this case are well developed in the record, and the relevant findings of fact are not disputed.

## IV. Choice of Law

This adversary action involved numerous issues of federal and state law. Most of the issues to be resolved in this appeal involve interpretations of federal bankruptcy law and federal law relating to the assignment of government contracts. Where state law is relevant, such as in First Trade's claim for conversion, the court will look to the laws of Massachusetts and New York. The Bankruptcy Court correctly ruled that these states have an interest in this proceeding and that their substantive laws are not inconsistent on the issues relevant to these appeals.

## V. Background

At the center of disputes before this court in these appeals are two companies, CEA and ATTI. They worked in the same field and had numerous transactions with each other over the course of their business relationship. As described by the Bankruptcy Court:

> [CEA] was in the business of providing hardware and software support for computer systems to government entities and businesses and installing electronic security systems. Its customers included local school districts, state prison agencies, the United States Bureau of Prisons, and the United States Air Force.

> \* \* \* \* \* \*

> [ATTI] designs and manufactures electronic testing equipment. The United States Air Force is one of its largest customers. It contracts with the Air Force both directly as a prime contractor and indirectly as a subcontractor. Gavilla is its president, and Levi is its executive vice-president in charge of contracts and general business matters.

*In re Computer Engineering Associates, Inc.*, 252 B.R. 253, 258–60 (Bankr.D.Mass. 2000).

CEA and ATTI had done previous work together on Air Force projects. The Bankruptcy Court described the particular Air Force contract at issue in this case, as follows:

> In July of 1990, the Debtor entered into an open-ended contract with the United States Air Force, a so-called SEES [Support Equipment Engineering Services] contract (the "Contract"), to provide engineering services at the Kelly Air Force Base in San Antonio, Texas . . . . The Air Force would, from time to time, issue delivery orders to CEA under the Contract, which orders were numbered sequentially from 1 to 57. Each delivery order related to a specific project or was a continuation of a previous delivery order. Between August 1, 1994 and September 29, 1994 the Air Force issued delivery orders 48, 49, 50, 51, 52, 53 and 55 under which the Debtor was to receive, in the aggregate, a fixed price of $2,850,111.53. The period of performance for the delivery orders was 12 months except in the case of delivery order number 53, which specified a 15 month period. It is unclear from the documents presented what the period of performance was for delivery order number 55.

> CEA subcontracted work on the delivery orders numbered 48, 49, 50, 51, 52, 53 and 55 to ATTI for a fixed price of $2,375,092.95 or 20% less than the amount the government had agreed to pay it. In other words, CEA was to receive $475,018.60 for its role in overseeing ATTI's performance under the delivery orders.

*Id.* at 260–61 (footnotes omitted).

One of the primary reasons CEA subcontracted this particular project to ATTI

was that it would require the use of a Benchtop Reconfigurable Automatic Tester ("BRAT"). ATTI was the manufacturer of the BRAT, and CEA did not own this technology. Moreover, the record indicates that no BRATs were available to CEA for work on this contract, except for the ones manufactured by and in the possession of ATTI. *Id.* at 261–62. The Bankruptcy Court's Opinion described the decision to subcontract the work to ATTI as follows:

> Barry MacKean ("MacKean"), a former site and program manager at the San Antonio office of CEA and a current employee of ATTI, testified about the circumstances surrounding CEA's decision to subcontract delivery orders 48, 49, 50, 51, 52, 53, and 55 to ATTI:
>
> > [T]he Government user basically comes forward with—he has a requirement. In this particular case it's the same particular government agent had used our contract before with us with a subcontract to ATTI to do this kind of work [sic]. He wanted to continue this work going on through with the same product, the BRAT system, so therefore he asked if we could do this with them, and I said sure, and established the normal contractor/subcontractor relationship.... (Transcript, February 15, 2000, pp. 58–59).
>
> He further testified that he approached the government agent on behalf of CEA to obtain the work exclusively for CEA:
>
> > In that late summer/fall, I in fact approached the government agent ... '94, the summer of '94. With just "How about if we could do this sort of thing" and it was my understanding that based on that discussion, that if it wasn't done through ATTI, well, then it was not going to be done or they would go directly to ATTI and bypass us, so I just backed up and suggested

> we press on and at least get the 20 per cent cut versus nothing. (Transcript, February 15, 2000, p. 59).
>
> There were several reasons why CEA utilized ATTI as its subcontractor with respect to the delivery orders. MacKean indicated that CEA lacked the personnel and equipment to perform the required engineering services. Specifically, CEA did not have the Benchtop Reconfigurable Automatic Tester, known as the BRAT (the "BRAT"), required by the government in the Statement of Work to be utilized in completing the delivery orders. Levi corroborated MacKean's viewpoint. He testified that:
>
> > BRATS are manufactured at ATTI, and I am responsible directly for the shipment of any BRAT that is shipped out of the premises or if a BRAT is manufactured. No BRAT was manufactured and shipped out prior to May of 1995, and that BRAT was shipped to Tinker [Air Force Base] on that date. Other than that, no other BRAT, except for the ones that we owned, were available any other place in the world, except for Europe or NATO. (Transcript, February 15, 2000, p. 147)

*Id.* at 261–62 (footnotes omitted).

CEA and ATTI entered into a contractor/subcontractor relationship, under which the U.S. government paid CEA, and then CEA would pay ATTI. The relationship soon encountered trouble as CEA began delaying payments to ATTI. These delays extended to between 60 and 90 days. Levi inquired about the reasons for delay.

Levi testified that McCorry and Solomon initially advanced a number of excuses to explain late payments, including problems with the government and CEA's computer system. Levi was un-

able to verify any problems with performance at Kelly Air Force Base and became increasingly uncomfortable with the excuses he was being given by Solomon and McCorry. Additionally, in March of 1995, he learned from McCorry that CEA was in fact being paid by the government. As a consequence, ATTI ceased submitting invoices to CEA and also stopped preparing monthly status reports. ATTI, however, continued to perform engineering services at Kelly Air Force Base under its subcontract without any significant disruption in the work schedule.

*Id.* at 263.

It is at this point that ATTI began to consider ways it could guarantee payment from CEA. ATTI did not want to cease production, because it wanted to maintain a good relationship with the Air Force, for which it did much business. Moreover, CEA wanted ATTI to continue working as subcontractor. CEA would not have had the financial ability to "complete performance under the Contract" without ATTI. *Id.* at 270. ATTI, which had a significant banking relationship with the State Bank of Long Island, came up with the following proposal:

It would be my intention to have State Bank [of Long Island], which is the bank we do business with, lend you the 20% portion which represents the difference between our contract amount and your contract amount.... CEA would agree to allow State Bank to collect the full amount on these delivery orders and disburse to ATTI its portion and retain the CEA portion as payment on the loan outstanding. CEA would add to the list of delivery orders those that belong to CEA alone and amounts received on these delivery orders would be sent to CEA. This assignment will be an irrevocable transaction on the part of CEA

and CEA would agree not to prepay or remove such assignment from State Bank until all delivery orders that ATTI was a part of have been finalized.

*Id.* at 263.

CEA and ATTI eventually entered into an agreement along these lines. As further stated by the Bankruptcy Court:

On or around June 21, 1995, CEA and ATTI entered into an agreement (the "Agreement") which contemplated the following: 1) the execution and delivery of an assignment of all proceeds of the various delivery orders to SBLI; 2) the establishment of an account with SBLI into which all proceeds of the Contract would be deposited and from which checks might be drawn and other withdrawals made with the duly authorized signatures of both CEA and ATTI; and 3) a loan from SBLI to CEA in the amount of $10,000.00.(SBLI's Exhibit 3). Additionally, CEA and ATTI executed various other documents, including a Corporate Resolution and Banking Agreement and an Assignment of Deposit Account (SBLI's Exhibit 2); CEA executed a Promissory Note in the Principal Sum of $10,000.00 and a Commercial Security Agreement in favor of SBLI (SBLI's Exhibits 4 and 5); CEA and SBLI executed an Assignment of Claim under Government Contract (the "Assignment")(SBLI's Exhibit 13); and CEA, ATTI and SBLI executed an Indemnity Agreement (SBLI's Exhibit 6).

*Id.* at 265.

The Bankruptcy Court also stated in a footnote:

The Agreement provided the following: WHEREAS, CEA and ATTI intend that the Loan Agreement will include the following terms and conditions which they understand to be acceptable to the Bank: (i) the principal and interest of the Loan will be due in a single balloon

payment at the time of the last payment received by the Bank under the contract and will be paid from the proceeds held in the Account; (ii) the Bank will not terminate its rights under the Assignment until the principal and interest of the Loan are paid in full; and (iii) CEA may not prepay the principal and interest due under the Loan until sixty (60) days after providing notice to the Bank of an intent to prepay.

*Id.* at fn. 16.

After initially rejecting the first Assignment of Claim to SBLI for failure to meet requirements of the Assignment of Claims Act, the government accepted a subsequently filed Assignment of Claim in mid-July of 1995. *Id.* at 268. ATTI ended up receiving $1,241,511.04 of the payments totaling $1,447,068.45 made by the government to the account at SBLI. *Id.* at 270–71. The loan of $10,000 from SBLI to CEA was repaid with interest on November 17, 1995. It was only one week later that CEA filed its bankruptcy petition. *Id.* at 271.

It is at this point that the relationship between ATTI and First Trade becomes relevant. First Trade claims that it had a security interest in CEA's contract with the Air Force stemming from its loan agreement with CEA. The Bankruptcy Court stated:

In June of 1995, FTU paid off the Debtor's obligations to Fleet and became the Debtor's primary lender. In the Loan and Security Agreement it executed, CEA agreed that it would not permit, "without the prior written consent of Lender [FTU], ... the creation or continued existence, whether by voluntary action or operation of law, of any security interest in or other encumbrance on the Collateral." (Plaintiffs' Exhibit 26). According to the loan documents, the imposition of a lien on FTU's collateral

would constitute an event of default rendering the unpaid balance of the notes and all unpaid accrued interest due and payable at FTU's option without notice or demand.

On June 1, 1995, FTU filed a UCC financing statement against the CEA's assets, including accounts receivable and contract rights. A few days later, on June 5, 1995, Fleet terminated its financing statement covering CEA's assets. By mid-June, CEA had expended all the loan proceeds advanced by FTU. The Plaintiffs, however, submitted no evidence as to whether or for how long CEA was able to service its debt to FTU before filing its bankruptcy petition. FTU did not learn of the transaction, described in detail below, pursuant to which ATTI completed performance under CEA's Contract at Kelly Air Force Base and CEA assigned the Contract to SBLI, until sometime in 1996 or 1997 when Attorney Martin contacted FTU and informed it of the transaction.

*Id.* at 264–65 (footnote omitted).

First Trade avers that ATTI had knowledge of the perfected security interest when it entered into the agreement with CEA and SBLI. *See* Docket No. 4 at 10. The Bankruptcy Court stated in its Opinion that an attorney for ATTI "did discover [First Trade's] UCC–1 Statement on June 23, 1995, before the acceptance of the Assignment by the government in mid-July 1995." *Computer Engineering Associates* at 268. First Trade avers in this Appeal "that ATTI and CEA conspired to structure an arrangement that would defeat First Trade's secured interest in all of CEA's assets, including the contract between the United States Air Force and CEA for work at the Kelly Air Force Base...." Docket No. 11 at 4.

CEA was unable to keep its business afloat and filed for bankruptcy under

Chapter 11 on November 25, 1995. CEA voluntarily converted to a filing under Chapter 7 in April of 1996.

After CEA converted to Chapter 7, in April of 1996, First Trade requested relief from the automatic stay. The motion was granted by the Bankruptcy Court. First Trade engaged in discussions with the Chapter 7 Trustee regarding its claim against CEA. As described by the Bankruptcy Court:

> On June 6, 1997, the Trustee filed an Application to Employ Special Counsel, Kenneth Martin ("Attorney Martin") and the law firm of Martin & Rylander. Specifically, the Chapter 7 Trustee sought authority to employ Attorney Martin "to pursue collection of a preference and conversion action against a company that received prepetition funds from the Debtor." The Chapter 7 Trustee stated that he and FTU had "agreed that the net recovery, after payment of attorneys' fees and costs, will be divided between First Trade Union and the estate, with the bankruptcy estate receiving 20% of such net recovery and First Trade Union receiving 80% of such net recovery." The Trustee disclosed that Attorney Martin represented FTU. In the affidavit filed in support of the Application, Attorney Martin did not disclose any connections with the Debtor or its principal, John Solomon. After notice and a hearing, the Court authorized the Chapter 7 Trustee to employ Attorney Martin. The Court, however, indicated that it did not believe that the FTU had a security interest in any avoidance power recoveries that the Trustee might obtain pursuant to 11 U.S.C. §§ 547–550 and that it would not determine how the proceeds of any recoveries would be divided among the Bank, Attorney Martin and the estate until such proceeds existed.

*Id.* at 258 (footnote omitted).

Despite this warning by the court, First Trade decided to continue its assistance to the Chapter 7 Trustee in pursuing its claim.

In the Adversary Proceeding before the Bankruptcy Court, First Trade brought claims against ATTI for conversion and turnover. The Trustee brought claims against ATTI for preference, fraudulent conveyance, insider preference and breach of good faith and fair dealing. All of these claims related to the money received by ATTI under the Assignment discussed above.

The Bankruptcy Court conducted a three-day trial and decided all claims in favor of defendants except for the preference claim. On the preference claim, the Bankruptcy Court found in favor of the Trustee against ATTI in the amount of $1,241,511.07. The Bankruptcy Court concluded, however, that First Trade did not have "standing or authority to bring an action to avoid a preferential transfer." *Id.* at 287. The court therefore decided in favor of ATTI on the preference claim by First Trade.

The Bankruptcy Court did not rule on whether the agreement between the Trustee and First Trade would be enforceable as to the $1,241,511.07 recovered by the Trustee, if First Trade had standing.

### VI. The Merits

█ ATTI's appeal of the Bankruptcy Court's decision on the preference claim underlies all of the issues to be decided by this court. The court will therefore decide this question first, and then will move on to address other issues that are not mooted by the court's decision on the preference claim.

The relevant statutory authority is found at 11 U.S.C. § 547(b):

Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property-

(1) to or for the benefit of a creditor

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made

(3) *made while the debtor was insol-vent*;

(4) made-

(A) *on or within 90 days before the date of the filing of the petition;* or

(B) *between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider*; and

(5) that enables such creditor to re-ceive more than such creditor would receive if-

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

Exceptions to applicability of section 547(b) appear in section 547(c), which provides that a Trustee is unable to avoid transfers that fit into certain categories. The record before this court is not clear as to why neither the parties in their briefs nor the Bankruptcy Court in its Opinion explicitly considered applicability of the ex-ceptions in 11 U.S.C. § 547(c)(1) and (2), which state:

(c) The trustee may not avoid under this section a transfer-

(1) to the extent that such transfer was-

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contempo-raneous exchange for new value given to the debtor;

(B) in fact a substantially contem-poraneous exchange;

(2) to the extent that such transfer was-

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee;

(C) made according to ordinary business terms

11 U.S.C. § 547(c)(1) and (2).

The "ordinary course of business" ex-ception discussed in 11 U.S.C. § 547(c)(2) may be applicable. At the time of the transfer (whether measured from the time of the assignment or the payments), CEA and ATTI had an executory contract with duties remaining to be performed by both sides. Moreover, the contract with the Air Force was a significant source of income for CEA. The Bankruptcy Court found that ATTI's technology was essential to completion of the Air Force contract, and thus the income from the Air Force would be lost if ATTI stopped working as sub-contractor on the project. CEA would have also opened itself to lawsuits by the Air Force and ATTI if it broke its agree-ments with them.

These circumstances appear, at this time, to support an argument that pay-ments to ATTI by CEA were in the ordi-nary course of business, and that ATTI was merely ensuring payment by a finan-cially-troubled CEA before continuing with

its performance. The fact that part of ATTI's performance had been recently completed does not refute the fact that the contract was still in an executory stage, with both ATTI and CEA having outstanding duties to perform.

As stated by the Court of Appeals for the Ninth Circuit:

> Thus, to apply Section 547(c)(2)(C), the court must look to "those terms employed by similarly situated debtors and creditors facing the same or similar problems. If the terms in question are ordinary for industry participants under financial distress, then that is ordinary for the industry." The determination requires "a factual inquiry that is appropriately left to the bankruptcy court."

*Arrow Electronics v. Howard Justus,* 218 F.3d 1070, 1073 (9th Cir.2000). *See also GasMark Limited Liquidating Trust v. Louis Dreyfus Natural Gas Corporation,* 158 F.3d 312, 317 (5th Cir.1998).

On the record before the court, it was reasonable for ATTI to take steps to ensure payment before processing the invoices and completing the work that would allow CEA to be paid. In these circumstances, it would be inequitable to allow CEA and the estate to benefit from ATTI's subsequent work, and to deny ATTI that benefit.

The "new value" provision in 11 U.S.C. § 547(c) may also be applicable. At the time ATTI and CEA were engaged in negotiations over payment, their contract was still in an executory stage. ATTI elected to continue with the contract, but in a way that guaranteed payment by CEA. If this accommodation is viewed as a new contract in which ATTI gave up the right to bring a claim for breach of contract in exchange for a guaranteed method of payment by CEA, it is possible that 11 U.S.C. § 547(c)(1) would also apply.

In these circumstances this court concludes that the Bankruptcy Court must further consider ATTI's right to payments under what was an executory contract at the time of the transfers. The court directs the Bankruptcy Court's attention to *Brandt v. Repco Printers and Lithographics,* 132 F.3d 104, where the Court of Appeals for the First Circuit extensively discussed the 11 U.S.C. § 547(c)(1) exception.

■ The question raised by ATTI on this appeal is whether the transfer of $1,241,511.07 from CEA to ATTI through their joint checking account with State Bank occurred outside the 90–day period described in the statute. In other words, did the transfer from CEA to ATTI occur before August 27, 1995? For the reasons stated below, the court determines that, as a matter of law, the transfer of the right to payment took place at the time of the assignment and thus outside the 90–day preference period. The court determines that the Bankruptcy Court incorrectly looked to the underlying loan agreements, without properly considering the plain language in the applicable federal statutes. Under that language, the assignment was valid and was perfected from the time of the assignment.

It is undisputed that the actual payments to ATTI took place within the 90–day period described above. Indeed, all of the payments occurred on or after September 12, 1995. *Computer Engineering Associates* at 270. ATTI argues, however, that the "transfer" for purposes of 11 U.S.C. § 547 occurred at the time of the assignment by CEA of the contract payment rights to SBLI. For purposes of this appeal, the court will treat the date of that assignment as July 19, 1995, the date when the government accepted the assignment. It is immaterial whether the assignment became operative before it was accepted

by the government, however, as both dates are before August 27, 1995.

Two statutory provisions are applicable to this analysis. Both the Assignment of Claims Act (31 U.S.C. § 3727) and the Anti–Assignment Act (41 U.S.C. § 15) generally prohibit the assignment of government contracts. An exception to both statutes exists, however, for assignments to financing institutions such as State Bank.

Although the Bankruptcy Court generally discusses the Assignment of Claims Act, both provisions are cited by the parties. The United States Claims Court explains:

> [A]s "the concerns of the two statutes and the legal concepts involved in their applicability are the same," cases arising under 31 U.S.C. § 3727 apply equally to cases arising under 41 U.S.C. § 15, and vice versa. *Tuftco Corp. v. United States*, 222 Ct.Cl. 277, 284 n. 4, 614 F.2d 740, 744 n. 4 (1980).

*United International Investigative Services v. United States*, 26 Cl.Ct. 892, fn. 2 (1992).

It is this court's opinion that the wording of 41 U.S.C. § 15 is even more helpful to appropriate analysis relevant to this case because it more directly involves the type of assignment at issue, and lays out in an organized fashion the requirements of a relevant assignment.

■ Some question exists as to whether the assignment complied with the strict requirements of the Assignment of Claims Act, especially when it was first presented to the government. In this case, however, the record shows a "clear assent to the assignment" given by the government's contracting officer, so the assignment must still be treated as complete as of July 19, 1995. *D & H Distributing Company v. United States*, 102 F.3d 542, 546 (Fed.Cir. 1996).

A material question before this court then is whether the date of the completed assignment was the effective date of the "transfer" of the $1,241,511.07 at issue in this case.

For purposes of the Bankruptcy Code, "transfer" is defined as:

> every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption

11 U.S.C. § 101(54).

The Bankruptcy Code gives further guidance at 11 U.S.C. § 547(e)(1)(B) as to when a transfer of something other than real property is perfected for purposes of section 547:

> For the purposes of this section-
>
> > (B) a transfer of a fixture or property other than real property is perfected when a creditor on a simple contract cannot acquire a judicial lien that is superior to the interest of the transferee.

11 U.S.C. § 547(e)(1)(B).

Determining whether a transfer has occurred (regardless of perfection) is straightforward. CEA has assigned to SBLI its right to payment under an executory contract with the Air Force. A future right to payment is an interest that can be assigned, and is an interest that exists in the present. As described in Farnsworth on Contracts:

> Whatever the impediments to the assignment of future rights, they do not apply to an obligee's assignment of a right under an existing contract that has not yet ripened into a right to demand performance because of a condition that has not yet occurred. This is true even if the condition that has not occurred is

the obligee's own performance, as in the case of a constructive condition of exchange. Such a right, though conditional, is an existing one. To return to the situation of the builder that has made a construction contract, the right to payment that the builder assigns, though constructively conditioned on the builder's finishing the building, is a right under an existing contract.

Farnsworth on Contracts, Second Edition, § 11.5 (1998); *see also* Restatement (2d) of Contracts, § 317.

 A court will ordinarily look to state law to determine whether the circumstances discussed in 11 U.S.C. § 547(e)(1)(B) have been met. Here, however, courts appropriately look to federal law as the assignment was made by the government under the Assignment of Claims Act, and the applicable statutes state what rights third parties have against the transferee. *See* 41 U.S.C. § 15 *and* 31 U.S.C. § 3727; *see also* Collier on Bankruptcy, Volume 5, § 547.05[2] (2001). A valid assignment under the Assignment of Claims Act can be enforced by the assignee against the government, even if the government pays another party. *See Bank of America v. United States,* 23 F.3d 380, 384 (Fed.Cir.1994). The assignment is equally enforceable if the government manifested "clear assent" to the assignment. *See Banco Bilbao Vizcaya–Puerto Rico v. United States,* 48 Fed.Cl. 29, 32–33 (2000).

No problem exists here on the ground of multiple assignees, as in *Banco Bilbao,* because State Bank is the only assignee. ATTI and CEA do maintain rights against State Bank, but this type of arrangement is contemplated in 41 U.S.C. § 15(3) as an "assignment . . . to one party as agent or trustee for two or more parties." It is beyond dispute that State Bank, and only State Bank, was the assignee under the Assignment of Claims Act. This fact is also noted on two separate occasions by the Trustee in his brief. *See* Docket No. 9 at ¶¶ 31 and 38.

The Bankruptcy Court, nevertheless, interpreted the assignment in the context of the agreements between CEA, ATTI, and State Bank regarding the establishment of the joint account. The Bankruptcy Court stated:

The Assignment of Claim, although denominated as absolute and irrevocable, did not give SBLI the right to keep the contract proceeds in excess of the amount of its loan to the Debtor in view of the Indemnification Agreement and the intention of the parties. CEA's agreement not to prepay the loan is consistent with that analysis. Clearly if CEA prepaid the loan, the Assignment of Claim would be unsupported and CEA would be entitled to receive the Contract proceeds directly. ATTI, given CEA's prior payment history, understandably was not willing to incur the risk of nonpayment and, therefore, insisted that CEA forego the right to prepay the loan, thereby ensuring that monies would flow through SBLI into the joint account. In this Court's decision with respect to SBLI's Motion for Summary Judgment, the Court recognized an issue as to whether, as the assignee of "all moneys due and to become due" under the Air Force Contract, SBLI obtained dominion and control over those monies such that it was not a mere conduit for the funds. The Plaintiffs emphasized the Assignment of Claims Act, but the Court found that the Assignment of Claims Act was irrelevant to the instant dispute where the United States paid SBLI "A/C Computer Engineering ASC" under its Contract with CEA. Thus, the Court determined that "the issue of SBLI's dominion and con-

trol over the monies due and to become due under CEA's contract with the Air Force could be determined with reference to the agreements signed by CEA, ATTI and SBLI and the common law respecting assignments." Slip op. at 268.

. . . . .

On the face of the assignment, CEA appears to have intended a present transfer of its right, title and interest in all funds due and to become due under the Contract and that the assignment was neither conditional nor revocable until the completion of the Contract. Nevertheless, pursuant to the Indemnification and an examination of the June 1995 transaction as a whole, the Court finds that SBLI intended to deposit monies into the joint account and that its rights vis a vis CEA were limited to the $10,000.00 loan amount. In other words, SBLI could not keep for itself the full amount of the Contract proceeds and was simply a conduit for the Contract proceeds. *See Bonded Financial Services, Inc. v. European Amer. Bank,* 838 F.2d 890 (7th Cir.1988). *See also Christy v. Alexander & Alexander of New York, Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey),* 130 F.3d 52, 58 (2d Cir.1997), cert. dismissed, 524 U.S. 912, 118 S.Ct. 2295, 141 L.Ed.2d 154 (1998). Moreover, CEA could, in effect, revoke the Assignment of Claim by prepaying the $10,000 loan to SBLI, although it represented to ATTI that it would not do so.

*Computer Engineering Associates* at 281–82.

I conclude that no authority exists for looking, in effect, underneath an assignment made under the Assignment of Claims Act to determine the respective contract rights of parties once the govern-ment has made a payment. As far as the government and State Bank were concerned, State Bank was entitled to all payments under the Assignment of Claims Act. ATTI and CEA may have had an action against State Bank if the monies received from the government were not distributed according to their agreements, but that is a separate issue distinct from whether a transfer of the payment rights from CEA to State Bank had already taken place.

The Bankruptcy Court may have been justified in looking at the underlying agreements to determine whether a fraud had occurred or whether the parties were behaving in bad faith in an attempt to evade the Bankruptcy Code. The Bankruptcy Court found, however, that the parties were operating in good faith and were not behaving in a fraudulent manner. *Id.* at 279–84. In these circumstances, the Bankruptcy Court was incorrect in ruling that the underlying agreements took precedence over the very clear language in 41 U.S.C. § 15, that the assignment must cover "all amounts payable under such contract and not already paid" as well as not being "subject to further assignment." The provision goes on to state:

> Notwithstanding any law to the contrary governing the validity of assignments, any assignment pursuant to this section, shall constitute a valid assignment *for all purposes.*

41 U.S.C. § 15 (emphasis added).

The Bankruptcy Court was also incorrect in determining that SBLI's rights extended only to the $10,000 amount of its loan to CEA. Neither the Assignment of Claims Act nor the Anti–Assignment Act provides any authority for this conclusion. Moreover, 41 U.S.C. § 15 applies only to "a bank, trust company or other financing institution." These types

of institutions are in the business of making loans and if Congress wanted to limit the assignment to the amount of the loan it could easily have done so. Again, no authority exists for allowing an underlying contract to provide a limitation that Congress did not.

The Bankruptcy Court also gave inappropriate weight to what it perceived to be the manifested intention of the parties to take advantage of the Assignment of Claims Act to guarantee payment to ATTI. The Bankruptcy Court concluded that because the loan from State Bank to CEA was for only $10,000, the purpose of the assignment was not to secure financing for CEA but instead to guarantee payment to ATTI. But any such manifested intention is not material to this decision.

As explained above, the only way to obtain an assignment of contract payments from the U.S. government is to comply with the requirements of the Assignment of Claims Act. If the assignor had been a private party, as opposed to the federal government, it is beyond dispute that ATTI could have received an outright assignment of the contract payments. Instead, because the assignor was the federal government, the assignment had to be to a financial institution. It has already been established that an "assignment ... to one party as agent or trustee for two or more parties" is permitted. ATTI should therefore not be penalized for taking advantage of the provisions of federal law where permissible because, as the Bankruptcy Court supportably found, ATTI was not conducting itself in a fraudulent manner.

The court concludes that the assignment to State Bank was valid and that CEA's *right to payment* under the contract was transferred to State Bank before the ninety day preference period in 11 U.S.C. § 547.

■ This conclusion is consistent with the longstanding rule that:

Assignment of right under an existing executory contract is effective from the time when the assignment is made, and payments subsequently made to an assignee cannot be attacked as voidable preferences even though at the time of the payments all the conditions of a voidable preference exist.

1 Grant Gilmore, Security Interests in Personal Property, § 710, p. 234 (1965) (referring to the Bankruptcy Code of 1898).

The inquiry does not end at this stage, however, as an additional provision in the Bankruptcy Code, not mentioned by the parties, must be considered before a court can determine whether an otherwise valid assignment can be avoided by the Trustee as a preferential transfer. The Bankruptcy Code states at 11 U.S.C. § 547(e)(3) that "[f]or the purposes of this section, a transfer is not made until the debtor has acquired rights in the property transferred."

The court has concluded that through the assignment, State Bank obtained a *right to future payments*, under the contract between CEA and the Air Force. These payments were not yet due. As explained above, ordinarily the fact that payment is not yet due does not affect the validity and effectiveness of the assignment. Disagreement among courts may exist, however, as to whether 11 U.S.C. § 547(e)(3) alters this conclusion when a payment is asserted to be an avoidable preference.

As stated in Collier on Bankruptcy:

One bankruptcy court has held that section 547(e)(3) also overrules those pre-Code decisions which held that an assignment of the right to payments is complete when made, and that subsequent payments made pursuant to the assignment are not transfers. In *In re*

*Diversified World Investments, Ltd.*, the debtor made an assignment of rents to a creditor outside the 90–day preference period, but, after filing a chapter 11 petition, sued (as debtor in possession) to recover rental payments made during the preference period. The court denied the creditor's motion to dismiss the debtor's complaint, finding that section 547(e)(3) "was intended to bring payments made pursuant to an assignment within the term 'transfer.'"

. . . . .

On similar facts, the court in *Beck v. International Harvester Credit Corp. (In re E.P. Hayes, Inc.)*, reached the opposite result, finding that "no basis exists for construing [section] 547(e)(3) as affecting settled law beyond its effect on after acquired property clauses." The court therefore held that the assignment of rights under a contract outside the preference period did not constitute a preference even though the payments were made during the 90 days immediately preceding the filing of the bankruptcy petition.

Collier on Bankruptcy, Volume 5, § 547.05[7][a] (2001) (footnotes omitted).

A Bankruptcy Court from the District of Massachusetts has agreed with the holding in *Diversified World*. *See In re Gull Air, Inc.*, 90 B.R. 10 (Bankr.Mass.1988). In *Gull Air*, a debtor leased an aircraft to a third party and assigned the rental payments to a creditor. The court held that 11 U.S.C. § 547(e)(3) applied to the assignment, and that the debtor (and thus the assignee) did not acquire rights in the payments until the actual transfer of payment.

■ I am not persuaded that this analysis affects the outcome in this case. As explained above, a right to payment is a *present right.* The fact that the right may

be conditional on the debtor's performance of a contract does not alter the fact that the debtor possesses the right to payment from the time of the assignment. *See* Farnsworth on Contracts, Second Edition, § 11.5 (1998); *see also* Restatement (2d) of Contracts, § 317.

As stated in Collier on Bankruptcy:

[T]he debtor [in *Diversified World*] had assigned its interest in the rentals long before bankruptcy and had nothing to transfer during the 90–day preference period.

Collier on Bankruptcy, Volume 5, § 547.05[7][a] (2001)

■ The court accepts, for purposes of determining the outcome of these appeals, the analysis in both *Beck* and Collier on Bankruptcy. Through a valid assignment the debtor transfers its present right to future payment and has nothing left to transfer. This holding emanates from the wording and purpose of 11 U.S.C. § 547. If the transfer is within the 90–day period, Congress has determined by statute that the payment is preferential. The 90–day preference period protects creditors against a debtor's picking and choosing creditors to pay before filing for bankruptcy. Here, the assignment of contract payments was made before the 90–day period, and thus the choice to pay State Bank could not have been a preference under statutory law. CEA had *no right* to receive any of the payments that were made during the preference period, and thus a transfer during that period could not have been a preferential transfer.

In the Order below, the court VACATES the decision of the Bankruptcy Court on the voidable preference issue and REMANDS for further proceedings.

■ This decision renders moot all of First Trade's issues on appeal that involve the voidable preference claim against

ATTI. The two remaining issues involve First Trade's conversion claim against ATTI. As to these claims the Bankruptcy Court considered both Massachusetts and New York law. As to Massachusetts law, the Bankruptcy Court stated:

> In *General Electric Co. v. Halmar Distributors, Inc.*, 968 F.2d 121, 129 (1st Cir.1992), the court stated that "[l]iability for conversion arises when 'Fone ... intentionally and wrongfully exercises acts of ownership, control or dominion over personal property to which he has no right of possession at the time.'" (citation omitted). In *Evergreen Marine Corp. v. Six Consignments of Frozen Scallops*, 4 F.3d 90, 95 (1st Cir. 1993), the court articulated four elements to establish a conversion claim:
>
>> A plaintiff asserting a conversion claim under Massachusetts law must show that: (1) the defendant intentionally and wrongfully exercised control or dominion over the personal property; (2) the plaintiff had an ownership or possessory interest in the property at the time of the alleged conversion; (3) the plaintiff was damaged by the defendant's conduct; and (4) if the defendant legitimately acquired possession of the property under a good-faith claim of right, the plaintiff's demand for its return was refused.

*Computer Engineering Associates* at 276.

The Bankruptcy Court then compared New York law:

> The elements of conversion are similar under New York law: "(1) the party charged has acted without authorization, and (2) exercised dominion or a right of ownership over property belonging to another (3) the rightful owner makes a demand for the return of the property, and (4) the demand for the return is refused." *Richardson Greenshields Securities Inc. v. Lau*, 819 F.Supp. 1246, 1268 (S.D.N.Y.1993) (citations omitted). With respect to damages, " 'the loss is to be measured as of the time of the conversion' ... [and] ... [t]he date of conversion is the date at which demand was made and refused." *The Bank of New York v. Amoco Oil Co.*, 35 F.3d 643, 660 (2d Cir.1994).

*Id.* at 276.

The Bankruptcy Court determined that two of the elements of conversion were not shown for either potentially applicable law. The Bankruptcy Court concluded:

> The Court finds that the Plaintiffs failed to prove both that they made a demand that was refused and damage resulting from the alleged conversion.
>
> FTU states that "[w]hen CEA executed the Assignment of Claims and entered the various agreements to effect the transfer of funds demanded by ATTI, CEA encumbered the Collateral covered by FTU's security interest ... [and] ... violated the terms of its financing agreements with FTU." It thus maintains that it "obtained a superior and immediate right to the funds that were ultimately transferred to SBLI and ATTI." Citing *Harley–Davidson Motor Co., Inc. v. Bank of New England–Old Colony*, 897 F.2d 611, 617–18 (1st Cir.1990), it argues that because the Debtor made an unauthorized transfer of collateral, which constituted a default under its security agreement, it obtained an immediate right to the collateral. FTU further argues that "[a]lthough over $1.5 Million was transferred to SBLI and ATTI through this transaction, CEA could not repay the loan under the Agreement. Such action on the part of ATTI and SBLI sufficiently eliminated First Trade Union's need to demand repayment."
>
> This Court rejects this argument as nonsensical. The Debtor warranted both to

ATTI in the Agreement and to SBLI in the Assignment as well as to both in the Indemnification Agreement that it was "the lawful owner of all rights under the Contract," that there was no impediment to the assignment and that its rights were "free and clear of all liens and encumbrances." Prior to acceptance of the Assignment by the government, ATTI learned that FTU had a prior perfected security interest in the account receivable. However, no evidence was submitted that SBLI was apprised by Grammas of FTU's security interest in the Kelly Air Force Base receivable. Additionally, there was no evidence that FTU made a demand for the receivable either pre– or postpetition. Indeed, the evidence is to the contrary. FTU apparently abandoned its interest in the receivable until it learned of the Assignment to SBLI from Attorney Martin in 1996 or 1997. It cannot now escape the consequences of its own neglect in failing to make a demand. Accordingly, the Court finds that FTU has failed to prove an essential element of conversion, namely a demand.

Moreover, FTU failed to prove another essential element of a claim for conversion, namely that it was damaged as a result of the alleged conversion. At the time CEA executed the Assignment to SBLI and the Agreement with ATTI, the Kelly Air Force Base receivable had no value because ATTI had ceased processing invoices and CEA lacked the financial resources to complete performance. Absent some type of agreement with ATTI, CEA would have defaulted on the Contract and FTU would have received nothing. Indeed, to the extent that the Debtor received $205,557.38 upon completion of the Contract, FTU's position was improved, although none of the parties submitted evidence as to whether CEA made any payments to FTU between June and November of 1995. If CEA had not entered into the Agreement with ATTI, ATTI would not have submitted invoices to CEA to enable CEA to receive the balance of the Contract proceeds.

*Computer Engineering Associates* at 276–77 (footnote omitted).

No basis appears in the record before this court or in the briefs of the parties for overturning the decision of the Bankruptcy Court on the issues regarding the law of conversion. Especially persuasive to the court is the fact that damages cannot be shown. Indeed, it appears that in fact First Trade may have benefitted from ATTI's actions because CEA was not forced to default on its contract with the Air Force. CEA was therefore able to stay in business longer and was able to earn its profit from the contract, profit that neither CEA nor its estate would have had access to but for the actions of ATTI.

The Bankruptcy Court also found that ATTI was not acting in bad faith, and thus was legitimately attempting to reach an accommodation with CEA under which ATTI would continue performing its contractual duties. ATTI had a right to claim payment for its ongoing services as subcontractor, and this claim of right was never challenged by First Trade until the proceedings before the Bankruptcy Court. The Bankruptcy Court's decision to dismiss the conversion claims by First Trade against ATTI is AFFIRMED in the Order below.

### ORDER

For the foregoing reasons, it is OR-DERED:

(1) State Bank of Long Island's Motion to Dismiss Cross Appeal of First Trade Union Bank, FSB (Docket No. 23 in Civil Action No. 01–10132–REK) is DENIED;

(2) Advanced Testing's Motion for William Barrett to Appear Pro Hac Vice (Docket No. 28 in Civil Action No. 01–10132–REK) is ALLOWED.

(3) The Clerk is directed to enter forthwith on a separate document a Final Judgment in Civil Action Nos. 01–10131–REK and 01–10132–REK as follows:

For the reasons stated in the Opinion of March 15, 2002:

(a) As to the Appeal by ATTI (Civil Action No. 01–10231–REK), the decision of the Bankruptcy Court is VACATED and the matter is REMANDED to the Bankruptcy Court for proceedings consistent with this Opinion.

(b) As to the Appeal by First Trade (Civil Action No. 01–10232–REK), the decision of the Bankruptcy Court is AFFIRMED as to the claims by First Trade of conversion and is DECLARED to be MOOT as to all other claims.