**WESTINGHOUSE ELECTRIC CO., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 02–1420C.

United States Court of Federal Claims.

June 5, 2003.

---

7. See *supra* note 5.

Steven F. Baicker–McKee, Pittsburgh, PA, for plaintiff. April Milburn–Knizner, of counsel.

Richard S. Ewing, U.S. Department of Justice, Washington, DC, with whom were Robert D. McCallum, Assistant Attorney General, and Director David M. Cohen, for defendant. James S. Carey, Pittsburgh Naval Reactors Office U.S. Department of Energy, of counsel.

## OPINION ON MOTION FOR SUMMARY JUDGMENT

FIRESTONE, Judge.

This matter comes before the court on defendant United States' ("government's") Motion for Summary Judgment. In this action, Westinghouse Electric Company, LLC ("LLC") seeks reimbursement and indemnification of the costs it has incurred in connection with cleaning up contamination generated by the previous owner during performance of a government contract. The government argues that this action must be dismissed on the grounds that LLC was not a party to the government contract and therefore lacks standing. The government further alleges that, to the extent LLC acquired contract rights against the government when it purchased assets from the former government contractor, the Anti–Assignment Act and the Assignment of Claims Act (collectively known as the "anti-assignment legislation") bars LLC's right to pursue its claim.

LLC argues that it is, in fact, the successor-in-interest to the original contracting party, and therefore succeeded to the original contracting party's rights and obligations

under that government contract by operation of law. LLC also contends that the government should be judicially estopped from arguing lack of privity on the grounds that the government argued in companion litigation in federal district court that LLC was bound by a release entered into by the original contracting party.[1]

For the reasons that follow, the court hereby **GRANTS** the government's Motion for Summary Judgment, filed January 31, 2003.

## FACTS

### A. Background Facts

The following facts are not disputed unless otherwise noted. On July 15, 1949, the Atomic Energy Commission ("AEC"), a predecessor of the Department of Energy ("DOE"), awarded to Westinghouse Electric Corporation ("WEC") a contract for the management and operation of the Bettis Atomic Power Laboratory ("Bettis"), a Government-owned, contractor-operated research and development facility dedicated to the Navy nuclear propulsion program (AT–11–1–GEN–14). The AEC and, subsequently, the DOE renewed and extended the contract over the course of five decades ("GEN–14 contract").

During the period of 1956 to 1960, the Bettis division of WEC subcontracted some of the work under the GEN–14 contract to a facility WEC owned in Blairsville, Pennsylvania, near Pittsburgh ("Blairsville facility"). In 1993, WEC became aware of radioactive material contamination at its Blairsville facility. WEC performed remediation or cleanup work at the Blairsville facility from 1993 until it sold the facility to plaintiff in 1999; plaintiff has continued cleanup work since that time.

In November 1997, WEC acquired CBS, Incorporated, and WEC changed its name to CBS Corporation ("CBS"). Throughout the late 1990s, WEC and CBS sold off substantial technological and industrial enterprises that once constituted WEC. The GEN–14 contract ultimately expired on January 31, 1999, at which time a subsidiary of Bechtel took over as the contractor for Bettis. Virtu-

ally all of the 2,600–plus managerial and non-managerial personnel who worked at the Bettis facility on the GEN–14 contract under WEC and CBS were employed by the successor contractor Bechtel.

In March 1999, British Nuclear Fuels, plc ("BNFL") and Morrison Knudsen Corporation teamed to purchase certain assets from CBS. BNFL purchased the commercial nuclear fuels assets of CBS, including the Blairsville facility. Relevant portions of the Asset Purchase Agreement include:

**Article 2 Sale and Purchase of Assets; Assumption of Liabilities**

**Section 2.2 Acquired Assets and Excluded Assets**

(a) *Acquired Assets.* The term "Acquired Assets" means all the business, properties, assets, goodwill and rights of Sellers ... other than the Excluded Assets ... including subject to Section 2.2(b): ...

> (viii) subject to Section 2.2(c), all Contracts, including all Government Contracts; ...

> (xii) subject to 2.2(c), all rights, claims and causes of action of the Sellers to the extent relating to the Business or any of the Assumed Liabilities or the Acquired Assets; ....

After the acquisition from CBS, BNFL transferred the assets it acquired, including the Blairsville facility, to an indirect wholly owned subsidiary that it named Westinghouse Electric Company, LLC ("LLC" or "plaintiff"). LLC asserts that pursuant to the contract between CBS and BNFL, it succeeded to "all of the assets and rights as to the Blairsville facility," including the right to sue the government for contamination at Blairsville. The government contends that "BNFL did not purchase the GEN–14 contract or any rights under that contract."

In May 2000, Viacom, Inc. merged with CBS; the merged entity adopted the corporate name Viacom, Inc. ("Viacom"). After the expiration of the GEN–14 contract in January 1999, CBS, and then Viacom, continued to work with DOE to close out the

---

**1.** *Westinghouse Elec. Co. v. United States*, Memorandum Opinion, United States District Court for the Western District of Pennsylvania, Civil Action No. 00–0895 (July 19, 2001).

GEN–14 contract. The close out work, which involved a myriad of issues including, reimbursable costs, patents, and pension assets and liabilities, required nearly two years and was completed in December 2000. As part of the close out, on December 22, 2000, Viacom executed a Final Release in which it released the Government from all claims that it had or might have in the future, with enumerated exceptions.[2]

**B. Procedural History**

On December 23, 1999, plaintiff filed a complaint in this court to recover cleanup costs incurred at the Blairsville facility by WEC and CBS from 1993 until the March 1999 sale of the assets to BNFL, as well as by plaintiff LLC from that sale date forward. The complaint asserted claims under the GEN–14 contract and under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601–9675. On May 3, 2000, by order of the court, the CERCLA claims were transferred to the United States District Court for the Western District of Pennsylvania. On May 19, 2000, the United States filed a motion to dismiss LLC's complaint in this court, arguing that LLC did not exhaust its administrative remedies under the GEN–14 contract in that it had not filed a claim with the DOE, as required by the contract. On May 22, 2000, LLC filed a claim with the DOE contracting officer, Henry A. Cardinali. On July 17, 2000, the contracting officer issued a decision denying LLC's claim. The contracting officer denied the claim on several grounds, including his finding that LLC was not a party to the GEN–14 contract and therefore did not have standing. On August 15, 2000, LLC filed an appeal of the contracting officer's decision with the DOE Board of Contract Appeals ("EBCA"). On April 11, 2001, this court dismissed LLC's complaint without prejudice, in order to allow the plaintiff to complete the administrative process and pursue the relief it was seeking in United States District Court.

On July 19, 2001, Judge Gary L. Lancaster of the District Court for the Western District of Pennsylvania, who was presiding over plaintiff's CERCLA claim, issued a memorandum opinion in which he denied the government's motion for summary judgment. The government had argued that LLC was not entitled to recovery because CBS, LLC's predecessor-in-interest, had released the government from such claims. Judge Lancaster ruled that the release did not extend to the cleanup costs at issue in the CERCLA action, and thus, LLC could pursue a contribution claim pursuant to 42 U.S.C. § 9613(f)(1) for reimbursement of its cleanup costs at the Blairsville facility. Thereafter, the parties reached a preliminary agreement, and Judge Lancaster dismissed the complaint without prejudice. The parties are currently finalizing a settlement agreement.

Meanwhile, on July 24, 2002, the EBCA issued a decision granting the government's motion to dismiss LLC's claim for reimbursement and indemnification under the GEN–14 contract for lack of standing. The EBCA ruled that LLC was not in privity of contract with the government. The EBCA determined that LLC did not obtain any enforceable rights under the GEN–14 contract when BNFL acquired the Blairsville facility from CBS. The EBCA further concluded that if LLC acquired any rights when it acquired the assets, those rights are not enforceable under the Anti–Assignment Act, 41 U.S.C. § 15. Specifically, the EBCA ruled that:

> The sale of assets by CBS in this case did not constitute a corporate reorganization. It did not make LLC the lone successor in interest under the contract. Every asset sale does not entitle the purchaser to bring a claim under the contract. In fact, only when the sale actually constitutes a corporate reorganization and only when the new owner of the assets becomes the actual contractor by operation of law does the new owner avoid the requirements of the anti-assignment of claims statutes and have the right to sue under the contract.

---

**2.** WEC also executed a Release of Claims in 1983. That Release of Claims was referred to in the memorandum opinion of the District Court for the Western District of Pennsylvania issued in July 2001.

EBCA No. C–0008316, 2002 WL 1760863 (July 24, 2002).

The EBCA also addressed LLC's contention that judicial estoppel should bar DOE from challenging LLC's right to seek indemnification from the government under the GEN–14 contract. In the CERCLA case, the government argued that LLC could not claim costs from the government because its predecessor-in-interest, CBS, or then WEC, had released the government from liability. In response to LLC's argument that the government had conceded that LLC had contract rights in the CERCLA case, the EBCA stated:

> The DOE argued that since WEC, the owner of the Blairsville Facility at the time [when the contamination occurred], was the only legal entity with a right to sue the DOE for cleanup costs due to contamination caused by performance of the GEN–14 contract, and since such rights were bargained away under the [1983] release agreement, LLC, as a succeeding owner, could not bring a claim for cleanup costs. Put another way, DOE argued that WEC could not transfer to LLC a greater right in the Blairsville Facility than it possessed. The District Court agreed, but found that the release did not cover the claims ... arising after the signing of the release.

(Footnotes omitted). The EBCA concluded:

> The DOE was perfectly within its rights to contend that LLC is barred by the release even though LLC is not a party to the GEN–14 contract because LLC is claiming for those [contract-related] costs.... The DOE's assertion of the release, however, does not contend or imply in any way that LLC was in privity of contract with DOE.... Imposing the doctrine of judicial estoppel here would be improper.

On October 17, 2002, LLC filed a complaint in this court initiating the current proceeding. The government responded with a motion for summary judgment on January 31, 2003. The issues were fully briefed and oral argument was held on May 29, 2003.

## DISCUSSION

### A. Standard of Review

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *See* Rules of the United States Court of Federal Claims 56(c). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505. In deciding whether summary judgment is appropriate, it is not the court's function "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249, 106 S.Ct. 2505. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of judgment." *Id.* at 248, 106 S.Ct. 2505.

### B. The Anti–Assignment Act Bars LLC's Contract Claims

#### 1. Introduction

The government argues first and foremost that LLC never obtained any contract rights against the government in the sale of assets from CBS, and therefore, LLC is not in privity of contract with the government. In such circumstances, the government argues that LLC's complaint must be dismissed for lack of standing.

LLC responds that the transaction between CBS and BNFL, transferred to BNFL, and then LLC, the right to seek cleanup costs under the GEN–14 contract because the assets transferred to BNFL included all rights, claims and causes of action belonging to CBS, including the right to seek cleanup costs under the contract. LLC asserts that there are material issues of fact regarding the rights LLC obtained under GEN–14 that preclude the court from granting summary judgment to the government on this issue.

The court agrees that there are issues of fact concerning the scope of rights transferred from CBS to BNFL (and thus LLC)

in the sale of assets. However, the court finds that it is not necessary to resolve those issues. As discussed below, even if the court assumes that CBS transferred to BNFL, and thus to LLC, the right to seek cleanup costs from the government under GEN–14, the transfer violated the Anti–Assignment Act, and therefore, the contract cannot be enforced against the government.

### 2. Anti–Assignment Legislation Bars the Assignment of Rights Under the GEN–14 Contract Without Government Consent

The government contends that even if CBS transferred to LLC the right to seek cleanup costs from the government under the GEN–14 contract, LLC cannot exercise that right, because the assignment occurred without the government's consent, and therefore, the transfer of contract rights is void under the Anti–Assignment Act. LLC argues in response that the transfer of contract rights from CBS to BNFL occurred by operation of law, and therefore, the transfer was exempt from the Anti–Assignment Act. 41 U.S.C. § 15 (2002). The case therefore turns on whether the transaction between CBS and BNFL falls within the ambit of the Anti–Assignment Act or is exempt by operation of law.

 It is well-settled law that the anti-assignment legislation generally prohibit the transfer of government contracts and the assignment of claims against the government. 41 U.S.C. § 15 (2002); 31 U.S.C. § 3727 (2002). The Anti–Assignment Act provides in pertinent part: "No contract or order or any interest therein, shall be transferred by the party to whom such contract or order is given to any other party, and any such transfer shall cause the annulment of the contract or order transferred." 41 U.S.C. § 15. Thus, the assignment of a government contract in violation of the statute is a void act. *See NGC Inv. and Dev., Inc. v. United States,* 33 Fed.Cl. 459, 463 (1995). The government can, however, waive the effect of the statute by recognizing the validity of the contract and the assignment after the fact. *NGC* at 464 (citing *Tuftco Corp. v. United States,* 222 Ct.Cl. 277, 285–86, 614

F.2d 740 (1980)). A transfer of contract rights will be upheld when the government recognizes it either expressly as by novations or implicitly as by ratification or waiver. *Id.* In addition, transfers or assignments occurring by operation of law are exempt from the statutes' application. *Johnson Controls World Servs., Inc. v. United States,* 44 Fed. Cl. 334, 343 (1999). *See Seaboard Air Line Ry. v. United States,* 256 U.S. 655, 657, 41 S.Ct. 611, 65 L.Ed. 1149 (1921); *see also Rel–Reeves, Inc. v. United States,* 221 Ct.Cl. 263, 606 F.2d 949, 954 n. 7 (1979). Transfers by operation of law include corporate mergers, consolidations, and reorganizations, where in essence the contract continues with the same entity, but in a different form. *Johnson Controls,* 44 Fed.Cl. at 343; *See Tuftco Corp.,* 222 Ct.Cl. at 285, 614 F.2d 740.

██ The government asserts that the sale of assets from CBS to BNFL was not related to the GEN–14 contract and was not part of any corporate reorganization associated with completing GEN–14 work. In such circumstances, the government argues that the sale of assets to BNFL did not transfer GEN–14 contract rights by operation of law. Rather, as a sale of assets, the CBS/BNFL transaction was not exempt from the restrictions of the anti-assignment legislation.

LLC argues in response that the court should look at the sale of the Blairsville facility and CBS's nuclear unit as a corporate reorganization that transferred by operation of law all contract rights relating to the work that had been preformed by that unit under GEN–14. LLC contends that, "[LLC] took control of the entire business unit and the commercial nuclear fuels operations unit remained intact. All of the assets and rights as to the Blairsville facility were transferred together ...." In such circumstances, LLC contends that the assignment from CBS is exempt from the anti-assignment legislation.

The court agrees with the government and the EBCA that the sale of assets from CBS to BNFL, and the subsequent transfer of the assets to LLC, did not constitute a corporate reorganization, whereby BNFL assumed CBS's GEN–14 contract rights as a matter of law. LLC's reliance on cases involving corporate reorganizations is misplaced. In con-

trast to *Johnson Controls* and other cases involving a corporate merger, consolidation, or reorganization where the entity performing the contract remains intact, this case does not involve a change in business structure. The entire CBS entity responsible for the GEN–14 contract was not sold to BNFL. Instead, another contractor became the successor to the GEN–14 contract. Further, BNFL acquired only a portion of the CBS business that had, in the past, performed certain services under the GEN–14 contract. LLC concedes that nothing in the transaction between CBS and BNFL involved the GEN–14 contract. Indeed, the closeout of the GEN–14 contract, which continued after the sale to BNFL, was conducted by CBS/Viacom alone.

In enacting anti-assignment legislation, Congress was interested in keeping the government from having to deal with multiple claimants. *United States v. Shannon,* 342 U.S. 288, 72 S.Ct. 281, 96 L.Ed. 321 (1952); *Hobbs v. McLean,* 117 U.S. 567, 6 S.Ct. 870, 29 L.Ed. 940 (1886). As the United States Supreme Court stated in *Hobbs:* "[These statutes] were passed in order that the government might not be harassed by multiplying the number of persons with whom it had to deal, and might always know with whom it was dealing until the contract was completed and a settlement made." *Hobbs,* 117 U.S. at 576, 6 S.Ct. 870; *Shannon,* 342 U.S. at 293, 72 S.Ct. 281. The case currently before this court involves similar policy concerns. Having closed out the GEN–14 contract with CBS, the government now faces additional claims arising under the contract by LCC. This is precisely the type of situation the anti-assignment legislation was aimed at preventing.

In view of the foregoing, this court agrees with the EBCA that this case is like *Appeals of Mancon Liquidating Corp. Intercontinental Mfg. Co., Inc.,* ASBCA No. 18304, 1974 WL 1675 (1974), in which the ASBCA correctly concluded that the sale of assets alone involves a voluntary transaction that falls within the scope of the Anti–Assignment Act.

Where, "[t]he assignment of [a] government contract as an incident to the sale of the assets of a business is not an involuntary assignment or transfer by operation of law [it is] barred by the statute." *Id.* Because the transfer of any contract claim from CBS to BNFL was part of an asset transfer that is subject to the Anti–Assignment Act, the transfer needed government approval to be binding against the government. Here, there is no evidence of any such approval by the government. Accordingly, to the extent the transaction between CBS and BNFL transferred any contract right to LLC, the transfer is void.[3]

### C. LLC Cannot Rely Upon Judicial Estoppel To Establish Contract Rights

█ LLC contends before this court, as it had before the EBCA, that the government should not be allowed to challenge LLC's right to seek relief under the GEN–14 contract through the doctrine of judicial estoppel. In particular, LLC charges that the government is bound by the position it asserted in the companion District Court CERCLA litigation, where the government argued that LLC was bound by the terms of the GEN–14 contract release. As LLC states, "the entire premise of the United States' motion [for summary judgment in the District Court] was its position that [LLC] was bound by the terms of the release in the GEN–14 Contract Modification signed by [WEC] in 1983." LLC contends that the District Court ruled that the release barred all claims against the government arising between 1948 and 1983. The government asserts that it is not barred by the doctrine of judicial estoppel from asserting LLC does not have contract rights under GEN–14, on the grounds that the elements for judicial estoppel are not satisfied.

Whether the court should apply judicial estoppel is a matter left to the sound discretion of the court. *See Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1565 (Fed.Cir.1996). The United States Supreme Court recently identified several factors for courts to consid-

---

**3.** The court is mindful that LLC is not without remedy. The CERCLA claim in the District Court for the Western District of Pennsylvania has allowed LLC to obtain contribution from the government for cleanup costs under 42 U.S.C. § 9613(f)(1).

er in exercising that discretion in *New Hampshire v. Maine,* 532 U.S. 742, 749, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001):

> First, a party's later position must be 'clearly inconsistent' with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second court was misled.' Absent success in a prior proceeding, a party's later inconsistent position introduces no 'risk of inconsistent court determinations,' and thus poses little threat to judicial integrity. A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*New Hampshire,* 532 U.S. at 750–51, 121 S.Ct. 1808 (citations omitted).

The court agrees with the government that judicial estoppel should not be applied in this case. First, the court agrees with the EBCA that the government is not taking an "inconsistent position" in this case from the position asserted in the CERCLA litigation. While it is no doubt true that the government attempted to dismiss LLC's CERCLA claim based on a release entered into under GEN–14, as the EBCA noted, the government never argued that LLC was a party to the GEN–14 contract. The government argued in the CERCLA litigation that any rights LLC obtained from CBS were subject to any releases that CBS had granted to the government. The government asserted that LLC could not stand in a better position than CBS with regard to the contamination generated under the contract with CBS. There is simply no evidence to suggest that the government argued that LLC became a party to the GEN–14 contract when it acquired the Blairsville facility. In such circumstances, the position the government is taking in this case and the position taken in the CERCLA case are not truly inconsistent. Absent a clear inconsistency between positions, the government should not be foreclosed from

arguing here that LLC does not have direct contract rights against the government. *See Bank Melli Iran v. Pahlavi,* 58 F.3d 1406, 1413 (9th Cir.1995) (the former position must be "truly inconsistent with [the] present position"). *See also Menominee Indian Tribe of Wisconsin v. Thompson,* 161 F.3d 449, 454–55 (7th Cir.1998).

LLC has also failed to show why judicial estoppel is needed to avoid the risk of "inconsistent court determinations." It is clear that the district court did not consider whether LLC was in privity of contract with the government in deciding the CERCLA motion. Indeed, the district court ruled that because LLC's cleanup claims arose after 1993, the CBS release under GEN–14 did not bar LLC's claims. *See* Memorandum In the United States District Court for the Western District of Pennsylvania, Civil Action No. 00–0895, at 7–8. Thus, a ruling by this court that LLC did not receive any rights under the GEN–14 contract from the CBS sale of assets is not "inconsistent" with the district court holding. *See Allen v. Zurich Ins. Co.,* 667 F.2d 1162, 1165–68 (4th Cir.1982). The integrity of the judicial process is preserved. As the Supreme Court observed in *New Hampshire,* the principal role of judicial estoppel is "to protect the integrity of the judicial process." *New Hampshire,* 532 U.S. at 749, 121 S.Ct. 1808. *See Data Gen. Corp.,* 78 F.3d at 1565.

Finally, LLC has not shown how the government will obtain an "unfair advantage" if it is allowed to challenge LLC's claim of contract privity. LLC has known throughout the contract-related litigation both before this court and the DOE, that the government does not believe that LLC obtained any rights under the GEN–14 contract and is not entitled to any recovery under the GEN–14 contract. The government made its position plain before the DOE contracting officer and the EBCA. This is not a case where the government is "playing 'fast and loose with the courts' " as a means of obtaining unfair advantage. *New Hampshire,* 532 U.S. at 750, 121 S.Ct. 1808 (quoting *Stretch v. Watson,* 6 N.J.Super. 456, 69 A.2d 596, 603 (1949)). The government has consistently

maintained that LLC does not have rights under the GEN–14 contract.

Given LLC's failure to satisfy the factors identified by the Supreme Court in *New Hampshire*, this court will not invoke the doctrine of judicial estoppel in this case.

## CONCLUSION

For the foregoing reasons, the court hereby **GRANTS** Defendant's Motion for Summary Judgment, filed January 31, 2003. Parties shall bear their own costs.